## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL ACTION FILE NO. |
| v. | : | 1:19-cr-00376-TWT-RGV |
| | : | |
| | : | |
| ANTONIO BERNARD MANNING, | : | : |
| JAMES LEON DANIEL, ADRIAN | : | |
| SANTOI STERLING, LEONARD | : | |
| RAY DAVIS, and RONALD | : | |
| EDWARD BUTLER | : | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants James Leon Daniel ("Daniel"), Adrian Santoi Sterling ("Sterling"), Leonard Ray Davis ("Davis"), and Ronald Edward Butler ("Butler"), collectively referred to as "defendants," are charged along with co-defendant Antonio Bernard Manning ("Manning") in a five-count superseding indictment with Hobbs Act conspiracy and attempted Hobbs Act robbery in violation of 18 U.S.C. § 1951(a), and brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), and Daniel and Sterling are also charged with Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and an additional count of brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). [Doc. 114].[1]

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

Daniel has filed a motion to dismiss and a supplemental motion to dismiss, [Docs. 93 & 173], which Davis has adopted, [Doc. 100]; see also [Doc. 97 & 99],[2] and Butler has also filed a motion to dismiss, [Doc. 130], which Sterling has adopted, [Doc. 172]; see also [Docs. 166 & 171].  Davis also has filed a motion to suppress cell tower and GPS data evidence, [Doc. 92]; see also [Doc. 137], and Sterling has likewise filed a motion to suppress geo-location and cell site evidence, [Doc. 167], both of which the government opposes, [Docs. 181 & 182], and Davis and Sterling have filed replies in support of their respective motions, [Docs. 184 & 194].  Daniel has filed a motion to suppress cell phone evidence, [Doc. 168], while Sterling has filed a consolidated motion to suppress evidence taken from a vehicle and his cell phone, [Doc. 96], both of which the government opposes, [Docs. 111 & 180], and Daniel and Sterling have filed replies in support of their motions, [Docs. 148 & 193].  Finally, both Davis and Daniel have filed a motion to suppress their statements, [Docs. 91 & 95], and following evidentiary hearings on their motions on March 18, 2021,[3] the parties filed post-hearing briefs, see [Docs. 222, 224, 225,

_____

[2] Davis also filed two supplemental briefs in support of his adopted motion to dismiss.  See [Docs. 174 & 177].

[3] See [Doc. 210] for a transcript of the evidentiary hearing held on Daniel's motion to suppress statements, [Doc 95], which will be referred to as "(Daniel Tr. at __)." See [Doc. 216] for a transcript of the evidentiary hearing held on Davis' motion to suppress statements, [Doc. 91], which will be referred to as "(Davis Tr. at __)."  In addition, the government submitted exhibits at both evidentiary hearings, which

233, 236, & 237].[4]  For the reasons that follow, it is **RECOMMENDED** that Davis'

motion to suppress cell tower and GPS data evidence, [Doc. 92], be **GRANTED**,

but that the other motions filed by defendants that have not been deferred to the

District Judge,[5] [Docs. 91, 93, 95, 96, 100, 130, 167, 168, 172, & 173], be **DENIED**.

## I.   INTRODUCTION

On June 3, 2020, a federal grand jury in the Northern District of Georgia

returned a superseding five-count indictment against the five defendants in this

case.   [Doc. 114].   According to the superseding indictment, Manning was

employed by Brinks, an armored car company, in Atlanta, Georgia, and had access

to armored car routes.  [Id. at 2].  The superseding indictment charges that Daniel

told Manning that he and others, whom he referred to as a "crew," were interested

in robbing a Brinks armored car or courier; that Manning gave Daniel armored car

route information; that Manning and defendants then scouted and targeted Brinks

armored cars and couriers to rob them of United States currency; and that

Manning and defendants ultimately robbed and attempted to rob the Brinks

---

will be referred to as "(Daniel Gov't Ex. __)" for Daniel's exhibits and "(Davis
Gov't Ex. __)" for Davis' exhibits.

[4] Manning has not filed any motions.

[5] Davis and Daniel also have filed motions to sever, [Docs. 90 & 94], but since these
motions present potential issues under Bruton v. United States, 391 U.S. 123 (1968),
these motions have been deferred to the District Judge, see [Docs. 208 & 209].

armored cars and couriers while they serviced ATMs in the Northern District of Georgia. [Id. at 2-3 (internal marks omitted)]. Specifically, defendants are charged with targeting for robbery Brinks armored cars that serviced the ATMs of the Regions Banks on Concord Road in Smyrna, Georgia, and on West Taylor Road in Griffin, Georgia. [Id. at 1-2].

According to the superseding indictment, Daniel and Sterling traveled to the area of the Regions Bank located on Concord Road on or about April 26, 2019, and while a Brinks employee was servicing an ATM, Sterling pointed a rifle at the employee and stated that he would kill him if he moved, and Daniel ordered the employee not to move, took a firearm from the employee, and stated that he was taking the money in his possession. [Id. at 4]. Daniel and Sterling allegedly stole approximately $120,000 in United States currency from the employee and escaped in a blue car. [Id.]. On or about August 11, 2019, Manning allegedly sent a text message to Daniel describing the name and address of a BB&T Bank located on Salem Road SE in Conyers, Georgia, where a Brinks armored car was scheduled to service an ATM later that day, and Manning then sent a second text message that read, "1:30 pm – 2 pm." [Id. at 4-5 (internal marks omitted)].

The superseding indictment further charges that on or about August 16, 2019, Daniel sent Sterling a text message containing the address of 422 Altoona Place, where defendants met that day to plan the robbery of a Brinks armored car;

Manning sent two texts to Daniel "telling him to travel to 'Regions 327 W Taylor St Griffin GA 30224' and 'BB&T 201 W Taylor St. Griffen [sic] GA 30223'"; Daniel sent a text to Manning, asking "'Do you know which way he's coming?'" and Manning responded to Daniel, "'Naw . . . that truck can't be tracked'"; defendants traveled with firearms to an area near the Regions Bank on West Taylor Street; a Brinks armored car arrived at the Regions Bank on West Taylor Street and as the courier tried to service the ATM, Sterling, Davis, and Butler approached the courier in a white Lincoln Town Car and Davis pointed a firearm at the courier, who then fled into the armored car; Butler removed an ATM tray from the ATM and drove to a location where Daniel was waiting nearby in a gray Dodge Charger; Sterling put a rifle in the trunk of the Dodge Charger; and the four defendants attempted to elude law enforcement officers in the Dodge Charger, but Daniel and Sterling were apprehended later that day after a high speed chase.  [Id. at 5-7 (alterations in original)].

The superseding indictment charges in Count One that beginning no later than sometime in March 2019, and continuing through August 2019, defendants conspired to commit Hobbs Act robberies, in violation of 18 U.S.C. § 1951(a).  [Id. at 1-7].  Count Two charges that on or about April 26, 2019, Manning, Daniel, and Sterling, aided and abetted by one another, knowingly and unlawfully committed a Hobbs Act robbery, in violation of 18 U.S.C. §§ 2 and 1951(a).  [Id. at 7].  Count

5

Three charges that on or about the same day, Manning, Daniel, and Sterling, aided and abetted by one another, did knowingly carry and use a firearm during and in relation to a crime of violence—a Hobbs Act robbery, as alleged in Count Two—and during and in relation to the commission of the offense, brandished a firearm, all in violation of 18 U.S.C. §§ 2, 924(c)(1)(A), and 924(c)(1)(A)(ii). [Id. at 8]. Count Four charges that on or about August 16, 2019, defendants, aided and abetted by one another, knowingly and unlawfully attempted a Hobbs act robbery, in violation of 18 U.S.C. §§ 2 and 1951(a). [Id. at 8-9]. Finally, Count Five charges that on or about the same day, defendants aided and abetted by one another, did knowingly carry and use a firearm during and in relation to a crime of violence—an attempted Hobbs Act robbery, as alleged in Count Four—and during and in relation to the commission of the offense, brandished a firearm, all in violation of 18 U.S.C. §§ 2, 924(c)(1)(A), and 924(c)(1)(A)(ii). [Id. at 9]. Defendants have filed several pretrial motions, [Docs. 91, 92, 93, 95, 96, 100, 130, 167, 168, 172, & 173], which are now fully briefed and ripe for ruling.

## II.    DISCUSSION

### A.    Motions to Dismiss the Indictment, [Docs. 93, 100, 130, 172, & 173]

Defendants move to dismiss Count Five of the superseding indictment, which charges them with brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), arguing that attempted Hobbs Act robbery is not a

crime of violence.  [Docs. 130, 172, & 173]; <u>see also</u> [Doc. 114 at 9; Doc. 171].[6] However, defendants concede that the Eleventh Circuit has held that attempted Hobbs Act robbery is a crime of violence and therefore, they present this argument for the sole purpose of preserving the issue for appeal.  [Doc. 93 at 1-2 (citation omitted); Doc. 100 at 1-2 (citation omitted); Doc. 130 at 2 (citation omitted); Doc. 173 at 2 (citation omitted); Doc. 174 at 1, 5-6 (citation omitted)]; <u>see also</u> <u>Brito v. United States</u>, No. 20-14077-C, 2021 WL 3008189, at *1 (11th Cir. Feb. 16, 2021) (citing <u>United States v. St. Hubert</u>, 909 F.3d 335, 351-52 (11th Cir. 2018), <u>overruled in part on other grounds by</u> <u>United States v. Davis</u>, 139 S. Ct. 2319 (2019)) (explaining that "attempted Hobbs Act robbery categorically qualifies as a crime of violence" under 18 U.S.C. § 924(c)).[7]  Accordingly, based on defendants' concession and the Eleventh Circuit's clear precedent on this issue, it is

---

[6] Daniel moved to dismiss Count Three of the original indictment, [Doc. 93], which Davis has adopted, [Doc. 100]; <u>see also</u> [Docs. 97 & 99].  The superseding indictment added two additional counts, and Count Three of the original indictment became Count Five of the superseding indictment.  <u>Compare</u> [Doc. 1 at 6], <u>with</u> [Doc. 114 at 9].  Accordingly, Daniel subsequently filed a supplemental motion to dismiss Count Five of the superseding indictment, [Doc. 173], and Davis filed a supplemental brief and correction, asking the Court to dismiss Count Five of the superseding indictment, [Doc. 177].  Additionally, as previously noted, Sterling has adopted Butler's motion to dismiss Count Five of the superseding indictment.  [Docs. 166 & 171].

[7] In light of this concession, the government did not brief these motions.  <u>See</u> (Daniel Tr. at 55-56; Davis Tr. at 75).

**RECOMMENDED** that defendants' motions to dismiss, [Docs. 93, 100, 130, 172, & 173], be **DENIED**.

**B.    Davis' Motion to Suppress Cell Tower & GPS Evidence, [Doc. 92]**

Davis moves to suppress "all cell-tower and GPS data and evidence related to [ his] cell phone, as well as any cell-tower data seized pursuant (or not pursuant) to a Court authorized search warrant."  [Doc. 92 at 1].  He argues that while the police obtained a search warrant for information, records, and data from T-Mobile Corporation that was associated with his cellular device, the search warrant affidavit failed to establish probable cause and thus violated the Fourth Amendment.  [Doc. 137 ¶¶ 2-3].[8]  Specifically, he argues that the search warrant affidavit failed to establish any nexus between the conduct described and the data sought from Davis' cell phone, as it identified phone records and data for a cell phone with the number 404-808-1056 but obtained a search warrant for data and records associated with the number 404-343-8995.   [Id. ¶¶ 11-13 (citations omitted)]; see also [id. at 10-13.  In response, the "government concedes that the search warrant for Davis' cell telephone (404-343-8995) should be quashed because

---

[8] Davis added that he "is entitled to an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), because the search warrant affidavit contained material falsehoods and omissions."  [Doc. 137 ¶ 3].  However, at the evidentiary hearing pertaining to Davis' motion to suppress statements, he withdrew his request for a hearing.  See (Davis Tr. at 73-74).

the application for it correctly recited the telephone number but established the nexus for another cell telephone."   [Doc. 182 at 1]; see also [id. at 3-4].[9] Accordingly, given the government's concession, see [id. at 1, 3-4; Doc. 184 at 1], it is **RECOMMENDED** that Davis' motion to suppress, [Doc. 92], be **GRANTED**.

## C.   Sterling's Motion to Suppress Geo-Location & Cell Site Data Evidence, [Doc. 167]

Sterling moves to suppress "any evidence offered by the [g]overnment to establish, or argue, that [he] was present or communicated with anyone at the alleged scene of a bank robbery in Smyrna, Georgia on April 26, 2019."  [Doc. 167 at 1].  Specifically, he argues that results obtained from applications for historical cell site location information are inadmissible because the government did not

---

[9] The government added that "to the extent that there is evidence from independent sources — cell tower dumps, text messages on coconspirator's telephones, etc. — the government should be permitted to use it."  [Doc. 182 at 4 (citing United States v. Noriega, 676 F.3d 1252, 1260 (11th Cir. 2012) ("explaining that under the independent source exception, evidence obtained from a lawful source that is independent of any Fourth Amendment violation is admissible")]. Thus, the government requested that the Court "quash the search warrant for [] Davis' telephone number 404-343-8995, but [] allow the government to use any evidence obtained from an independent source."  [Id.].  At the evidentiary hearing on Davis' motion to suppress statements, defense counsel conceded that Davis lacks standing to object to evidence obtained from his co-defendants' cell phones but asked the government for clarification regarding any cell tower dumps that it intended to use, (Davis Tr. at 73-74), and in response, the government explained that it had confirmed with the relevant law enforcement agencies that there were no cell tower dumps with respect to the attempted robbery in Griffin, (Davis Tr. at 74).

obtain a warrant and the applications sought cell site location records from April 19 and April 23 although the robbery did not take place until April 26, and there was insufficient justification to obtain these earlier records based on mere speculation that the perpetrators would have been at the location days before.  [Id. at 3-4].[10]  The government responds that warrants are not required for cell tower dumps and even if they were, the good faith exception to the exclusionary rule would apply since there is no binding precedent requiring a warrant.  [Doc. 181 at 2-7].  Additionally, the government argues that it was reasonable to obtain cell tower dump and geo location information for up to one week before the robbery where the evidence showed that defendants planned it and scouted the target.  [Id. at 7].  In reply, Sterling asserts that courts are divided on the issue, with several

---

[10] Sterling adds that the government filed an application for information from Google, Inc., but he has not received anything in discovery "showing a return on warrant or any results from the application/affidavit for information from Google, Inc.," and therefore, he reserves the right to amend his motion as needed once any such information has been obtained and reviewed.  [Doc. 167 at 1-3]; see also [Doc. 167-1].  In response, the government asserts that counsel "attempted to email it to defense counsel on November 30, 2020, however it consists of 4KB of information" and thus, the "government requests that defense provide a suitable medium for this information."  [Doc. 181 at 2 n.1].  In his reply brief, Sterling asserts that he still "reserves the right to amend this motion as to his challenge to the Google warrant, because Sterling has still not received the requested information from the [g]overnment showing how to read and process the voluminous data received." [Doc. 194 at 1]; see also [id. at 10].  Sterling has not sought to amend his motion to challenge the information obtained from Google, so this issue is deemed to have been abandoned.

finding that a warrant should be required.  [Doc. 194 at 2-3].  He also argues that the government failed to provide minimization safeguards to protect the information of innocent parties and failed to mention in the second application that a prior application had been filed, which prevented the issuing Magistrate Judge from making an informed decision.  [Id. at 5-7].

The government submitted three applications for cell tower records pursuant to 18 U.S.C. §§ 2703(c)(1) and (d) in this case.  See [Docs. 167-2, 167-3, & 167-4].  First, on April 30, 2019, the government filed an application for cell tower records seeking "a court order authorizing the disclosure of historical cell tower data and related records for the [] cellular telephone towers that provided cellular service to:" (1) "888 Concord Road, SE, Smyrna, Georgia 30080 [('888 Concord Road')], on April 26, 2019, from 1:35 p.m. to 2:15 p.m." and (2) "4495 S Cobb Drive [('4495 S. Cobb Drive')], Smyrna, Georgia 30080, on April 26, 2019, from 1:00 p.m. to 1:30 p.m."  [Doc. 167-2 at 1].  In the "Factual Predicate" section of this application, the government explained that the Federal Bureau of Investigation ("FBI") was conducting an investigation of an armored car robbery that occurred on April 26, 2019, at the ATM of Regions Bank located at 888 Concord Road and in the vicinity of 4495 S. Cobb Drive; that the "suspects involved in this crime may not have acted alone and had a getaway driver waiting"; that "suspects of robberies commonly use cellular devices to plan, scout, and execute their crimes

and typically have their cellular devices in their possession during the execution of the crimes"; that "[i]f the suspects were in possession of a cell phone during the crime, they may have conducted cell phone activity before the robbery occurred, during, or shortly after which would have registered on a cell phone tower closest to the incident location"; and that "the requested records [would] help the [FBI] to identify any wireless device/s used by the unknown perpetrator during the . . . criminal conduct."  [Id. at 3-4 (emphasis omitted)].

A second application was filed on May 31, 2019, seeking another court order authorizing the disclosure of historical cell tower data and related records for the cellular telephone towers that provided cellular service to 888 Concord Road on April 19, 2019, from 11:50 a.m. to 1:20 p.m.; on April 23, 2019, from 9:30 a.m. to 11:00 a.m.; and on April 26, 2019, from 11:00 a.m. to 1:40 p.m.  [Doc. 167-3 at 1]. The factual predicate for this application was substantially similar to the previous application, but added that it was "common for suspects to follow an armored car delivery route prior to attempting a robbery"; that "robbers conduct casing and/or maintain surveillance of an armored car in order to learn the routine of its personnel, detect security weaknesses, and select the optimum place along an armored car route to commit a robbery"; that it was "not uncommon for such casing and/or surveillance to occur on more than one occasion (e.g., two to three times)"; and that "cell tower information [was] sought for the dates of April 19,

2019 and April 23, 2019 because those [were] the two prior dates that a Brinks armored car made a delivery to or serviced the ATM at the Regions Bank at 888 Concord Road" and were "the most likely dates when the robbers would have conducted casing and/or surveillance before the robbery on April 26, 2019."  [Id. at 4-6].  The government then filed an amended application for cell tower records on June 3, 2019, "because the previously submitted application and order did not state what time zone[] was involved," and explained that since "the application concern[ed] matters in the Northern District of Georgia, all times referred to [ were] in the Eastern Standard Time [] zone."  [Doc. 167-4 at 1].[11]

Under the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 et seq., a "governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) [] when the governmental entity[] . . . obtains a court order for such disclosure[.]"  18 U.S.C. § 2703(c)(1)(B).  The SCA provides that a court of competent jurisdiction shall issue a court order "only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought[] are relevant and material

---

[11] The other information in the application remained the same.  Compare [Doc. 167-3], with [Doc. 167-4].

13

to an ongoing criminal investigation."  18 U.S.C. § 2703(d).  "While this statutory standard is less than the probable cause standard for a search warrant, the government is still required to obtain a court order and present to a judge specific and articulable facts showing reasonable grounds to believe the records are relevant and material to an ongoing criminal investigation."  United States v. Peragine, CRIMINAL ACTION NO. 1:15-cr-00395-WSD-RGV-1, 2016 WL 11440140, at *6 (N.D. Ga. July 6, 2016), adopted by 2016 WL 4072746, at *4 (N.D. Ga. Aug. 1, 2016) (citation and internal marks omitted).

Sterling argues that Carpenter v. United States, 138 S. Ct. 2206 (2018), "stands for the proposition that historical cell site location information as sought here is obtainable only through a warrant."  [Doc. 167 at 3].  However, as the government points out in its response, [Doc. 181 at 2 (citation omitted)], and Sterling apparently concedes in his reply, [Doc. 194 at 2], the Supreme Court's decision in Carpenter was "a narrow one," and the Court did "not express a view on matters not before [it]: real-time [cell-site location information] or 'tower dumps' (a download of information on all the devices that connected to a particular cell site during a particular interval)."  138 S. Ct. at 2220.  Thus, while Carpenter held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through [] cell-site location information," it "left open the possibility that the government could collect cell-

14

site location information in real time or through 'tower dumps' not focused on a single suspect," which is what Sterling's motion concerns.  <u>United States v. Trader</u>, 981 F.3d 961, 968 (11th Cir. 2020) (alteration, citations, and internal marks omitted); <u>see also</u> <u>United States v. Adkinson</u>, 916 F.3d 605, 611 (7th Cir. 2019) (per curiam) (citation omitted) (explaining that <u>Carpenter</u> "did not invalidate warrantless tower dumps (which identified phones near *one location* (the victim stores) at *one time* (during the robberies)) because the Supreme Court declined to rule that these dumps were searches requiring warrants.").

Sterling argues the tower dumps were overbroad, as they sought cell site location records from April 19 and April 23, 2019, even though the robbery did not take place until April 26, 2019.  [Doc. 167 at 4].  Sterling also argues that the tower dumps were overbroad because the government failed to minimize its request to protect the privacy of innocent users since the length of the intrusions totaled seven hours across the applications.  [Doc. 194 at 5-6].  The applications specifically requested the telephone call number and unique identifiers for each wireless device in the vicinity of the tower; the source and destination telephone numbers associated with each call, text message, or data transmission; the date, time, and duration of each communication; the sectors that received a radio signal from each locally serviced wireless device; and the type of communication or transmission transmitted through the tower (e.g., phone call, data transmission, or text

message).  [Doc. 167-2 at 5-6; Doc. 167-4 at 6-7].  The first application sought cell tower records for 888 Concord Road from 1:35 p.m. to 2:15 p.m. on April 26, 2019, and for 4495 S. Cobb Drive from 1:00 p.m. to 1:30 p.m. on April 26, 2019, [Doc. 167-2 at 1], and the amended second application sought cell tower records for 888 Concord Road from 11:00 a.m. to 1:40 p.m. on April 26, 2019; 9:30 a.m. to 11:00 a.m. on April 23, 2019; and 11:50 a.m. to 1:20 p.m. on April 19, 2019, [Doc. 167-4 at 1].

"Looking at the information revealed by the tower dumps, it does not present the Fourth Amendment concerns present in Carpenter."  United States v. Rhodes, CASE NO. 1:19-CR-0073-AT-LTW, 2020 WL 9461131, at *3 (N.D. Ga. June 18, 2020), adopted by 2021 WL 1541050, at *2 (N.D. Ga. Apr. 20, 2021).  "[L]ong-standing Supreme Court precedent holds that a person has no protected privacy interest in records of telephone records dialed," and the government similarly does not "need a warrant to obtain information regarding the subscriber (and possible user) of a cell phone."  Id. (citation and internal marks omitted) (citing United States v. Jenkins, Case No. 1:18-cr-00181, 2019 WL 1568154, at *4 (N.D. Ga. Apr. 11, 2019)).  The information sought in this case was "necessarily limited by the physical location of each particular tower."  Id.  Sterling "has not shown that these records contained the type of precise location information the Supreme Court held subject to an individual's legitimate expectation of privacy."  Jenkins, 2019 WL 1568154, at *4.  "He has not shown, for example, that this information

tracks a person's movement with near 'GPS-level precision' like the [cell-site location information] in *Carpenter*"; he "has not shown that it tracks a person's movements from a public thoroughfare 'into private residences, doctor's offices, political headquarters, and other potentially revealing locales'"; and he "has not shown that it enables the government to obtain 'near perfect surveillance, as if it had attached an ankle monitor to the phone's user.'" Id. (quoting Carpenter, 138 S. Ct. at 2218-19).

As for Sterling's argument that seeking cell tower records for the dates prior to the date the robbery was committed rendered the applications overbroad, [Doc. 167 at 4], the government responds that "[t]his argument defies both logic and common sense because unlike a random street robbery, the robbery of an armored car takes advance planning, scouting and coordinating," and thus, the "government's request for cell tower information for up to one week before the April 26, 2019 armored car robbery is reasonable," [Doc. 181 at 7]. The Court agrees. Indeed, as the government explained in the amended second application, the requests were made for April 19 and April 23, 2019, because robbers typically conduct casing or maintain surveillance of armored cars before committing such a robbery and those dates were the two prior dates that a Brinks armored car made deliveries to or serviced the ATM at Regions Bank on 888 Concord Road, where the April 26, 2019, robbery ultimately occurred. [Doc. 167-4 at 4-6]. Thus, the dates

17

for which records were sought were not random dates based on "mere speculation that the perpetrators would have been at the [] location days before," as Sterling suggests.   See [Doc. 167 at 4].   "Because the information obtained by the [g]overnment in this case does not implicate the kinds of privacy concerns present in Carpenter, and because [Sterling] cites to no other binding authority holding that a warrantless tower dump violates the Fourth Amendment,"[12] the Court

_____

[12] Sterling argues that "ever-growing authority suggests that a cell tower dump application should require a showing of probable cause, and be presented in the form of a search warrant application," [Doc. 194 at 3], and he cites several cases, see, e.g., Matter of Search of Info. Stored at Premises Controlled by Google, 481 F. Supp. 3d 730, 739-40 (N.D. Ill. 2020) (footnotes omitted) (discussing that the "Seventh Circuit has not yet addressed whether tower dumps or the use of cell-site simulators are Fourth Amendment searches"; the "real-time [cell-site location information] cases outside the Seventh Circuit ha[d] gone in different directions, but none of those results definitively answer[ed] the question of how long a governmental intrusion must be in order for it to trigger Fourth Amendment scrutiny"; and that the "'tower-dump' cases [also did not] offer much more help in answering that question," and ultimately declining to "reach the questions that Carpenter . . . left unanswered"); United States v. Stachowiak, Case No. 18-cr-296-SRN-KMM, 2019 WL 3292048, at *6 n.6 (D. Minn. Apr. 23, 2019), adopted by 2019 WL 2560519, at *6 (D. Minn. June 21, 2019) (citations omitted) (acknowledging that "Carpenter [] declined to discuss any views on 'real-time [cell-site location information],'" but finding that "the same concerns that motivated the majority's conclusion in Carpenter regarding historical [cell-site location information], including the intrusion on personal privacy occasioned by the ability of law enforcement to use cell-phone location data to compile comprehensive information about an individual's past movements, apply with equal force to real-time GPS monitoring of a cell-phone's location"); United States v. Chavez, Case No. 15-CR-00285-LHK, 2019 WL 1003357, at *11 (N.D. Cal. Mar. 1, 2019) (emphasis added) (citations omitted) ("Post-Carpenter, the government must obtain a warrant supported by probable cause to access historical cell-site location information unless an exception to the exclusionary rule applies.   Eventually, the same may be expected of real-time cell-site location information, where an individual has

concludes that this was a "valid mechanism for the [g]overnment to obtain the information at issue." Rhodes, 2020 WL 9461131, at *3.[13]

The government also argues that even if a search warrant were required for cell tower dumps, the good faith exception to the exclusionary rule would excuse the absence of a warrant in this case where there was no binding precedent requiring a warrant. [Doc. 181 at 3]. Under United States v. Leon, 468 U.S. 897, 919-21 (1984), "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate[.]" United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18 (N.D. Ga. Aug. 4,

---

arguably an even greater expectation of privacy."); see also [Doc. 194 at 3 n.1]. However, Sterling has not directed the Court to any binding precedent holding that tower dumps, like the ones at issue in this case, constitute searches under the Fourth Amendment, and the Court finds more persuasive the reasoning in Rhodes, which involved facts closely analogous to this case.

[13] Sterling also argues for the first time in his reply that because the government failed to disclose in its amended second application that there had been a previous application, the issuing judge was unable to adequately assess the propriety and invasiveness of the volume of the request, and therefore, all the data sought in the amended second application should be suppressed. [Doc. 194 at 1-2, 6]; see generally [Doc. 167]. However, arguments raised for the first time in a reply brief are not properly before the Court. See United States v. Harris, 296 F. App'x 736, 737 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted). In any event, Sterling does not cite any authority to support his position, and the Court finds his argument unpersuasive.

2015), adopted at *5 (citation and internal marks omitted); see also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (citation omitted); United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) ("*Leon* . . . stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause.").

The Leon good faith exception applies in all but four circumstances:

(1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 422 U.S. 319 . . . (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid.

Martin, 297 F.3d at 1313 (citation and internal marks omitted).

The Leon good faith exception also "has been extended to situations where officers are called upon to interpret or rely upon an external source of authority such as a statute, which later turns out to be invalid or not to authorize the action taken, or where officers have based their conduct on recognized exceptions to the warrant requirement itself, such as consent." United States v. Gonzalez, 969 F.2d 999, 1004 n.7 (11th Cir. 1992) (citations omitted). "Evidence obtained during a

search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." Davis v. United States, 564 U.S. 229, 241 (2011); see also id. at 249-50 (holding that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply"). "The purpose of the exclusionary rule is to deter unlawful police misconduct; therefore, when officers engage in objectively reasonable law enforcement activity and have acted in good faith . . . , the *Leon* good faith exception applies." United States v. McClure, 160 F. App'x 842, 845 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted); see also United States v. McGough, 412 F.3d 1232, 1239-40 (11th Cir. 2005) (citation omitted).[14]

Sterling posits that the good faith exception only "protects [g]overnment agents who make an evaluation of probable cause" and that there "is no authority whatsoever for conducting a Leon analysis except within the context of evaluating the legality of an executed warrant" or for "extending that principle to the lesser standard in merely believing that specific articulable facts exist to support the granting of a [§] 2703 [a]pplication." [Doc. 194 at 8-9 (footnote, emphasis, and citation omitted)]. This position is unfounded. In United States v. Joyner, 899 F.3d 1199 (11th Cir. 2018) (per curiam), the Eleventh Circuit applied the good faith

---

[14] The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal [in light of] . . . . all of the circumstances." Leon, 468 U.S. at 922 n.23.

exception "to hold that historical cell site records that the government obtained using an order obtained pursuant to the [SCA] pre-*Carpenter* were not subject to suppression." United States v. Pendergrass, CRIMINAL ACTION FILE NO. 1:17-CR-315-LMM-JKL, 2018 WL 7283631, at *13 (N.D. Ga. Sept. 11, 2018), adopted by 2019 WL 102377, at *2 (N.D. Ga. Jan. 4, 2019) (citations omitted).  Because Carpenter had not been decided until after the government obtained the orders compelling cell site records pursuant to the SCA in that case, there was no binding precedent at that time requiring a warrant for the information at issue and the Eleventh Circuit determined that the good faith exception applied.  Joyner, 899 F.3d at 1204-05.  Thus, the Joyner decision refutes Sterling's contention that the good faith exception is not applicable to orders obtained under the SCA.  See id.[15] Accordingly, in the absence of binding authority applying Carpenter to tower dumps, even if obtaining the information by court order was contrary to the Fourth Amendment, the good faith exception applies in these circumstances, and

---

[15] Sterling also argues that the Court should not apply the good faith exception because all of the cases cited by the government were decided before Carpenter. [Doc. 194 at 8].  The Court notes that several cases have applied the good faith exception in this context since Carpenter was decided, e.g., Joyner, 899 F.3d at 1204-05; Rhodes, 2020 WL 9461131, at *4 n.4; United States v. Pendergrass, CRIMINAL ACTION FILE NO. 1:17-CR-315-LMM-JKL-1, 2019 WL 2482169, at *2 (N.D. Ga. Feb. 6, 2019), adopted by 2019 WL 1376745, at *2 (N.D. Ga. Mar. 27, 2019), aff'd, 995 F.3d 858 (11th Cir. 2021), and therefore, finds this argument to be without merit.

the investigators relied in good faith on the court orders obtained.  See Rhodes,

2020 WL 9461131, at *4 n.4.[16]  Therefore, it is **RECOMMENDED** that Sterling's

motion to suppress geo-location and cell site information data, [Doc. 167], be

**DENIED**.[17]

## D.   Sterling and Daniel's Motions to Suppress Evidence, [Docs. 96 & 168]

Sterling moves to suppress evidence obtained from searches of the Dodge

Charger and his cell phone and requests a Franks Hearing, [Doc. 96], and Daniel

moves to suppress any and all evidence obtained as a result of the search of his

cell phone, [Doc. 168].  The government opposes both motions, [Docs. 111 & 180],

and for the reasons that follow, the motions are due to be denied.

---

[16] The non-binding precedent cited by Sterling, see [Doc. 194 at 3 & n.1 (citations omitted)], does not change the Court's conclusion that the good faith exception applies in this case, see United States v. Dooley, Criminal File No. 1:11-CR-255-3-TWT, 2013 WL 2548969, at *11 n.28 (N.D. Ga. June 10, 2013), adopted at *3 (citations omitted) (rejecting defendant's contention that "law enforcement may not rely on the good faith exception to the exclusionary rule because legal precedent from other districts at the time the GPS tracker was installed suggested that installing the GPS tacker without a warrant may violate the Fourth Amendment" because, "given the specificity of the Supreme Court's holding in Davis, the good faith exception does not require an officer to consider precedent regarding the legal issue at hand from all judicial districts").

[17] The Court notes that while Sterling's motion to suppress requests an evidentiary hearing, he has not articulated any basis for holding an evidentiary hearing on the issues raised in his motion, see [Doc. 167 at 4], and because Sterling has not presented any valid grounds for suppression for the reasons discussed, his request for an evidentiary hearing is **DENIED**.

1.      **Statement of Facts**

As part of the investigation of the August 16, 2019, attempted armed robbery of the Brinks' armored car, Investigator Adam Trammel ("Inv. Trammel") of the Griffin Police Department ("GPD") reviewed surveillance footage from other businesses in the vicinity of the Regions Bank, which revealed:

> [A] grey in color Dodge Charger and white Lincoln Towncar [sic] traveling east bound on W. Solomon Street.  Both vehicles make a right turn onto N. 9th St. traveling south bound.  At this time[, the footage shows] the person in the back seat has on a red shirt.  Both vehicles then pull into Direct Alarm, 233 W. Solomon St. Griffin, GA 30223.  Three occupants get out of the white Lincoln Towncar [sic] and enter the grey Dodge Charger.  One of the occupants appears to have dreads.  He puts what appears to be a long gun in the trunk of the Charger and then gets into the Dodge Charger.  The Dodge Charger then leaves Direct Alarm and drives toward West Taylor Street.  The Dodge makes a right turn onto West Taylor Street traveling west bound.

[Doc. 111-1].  Following Sterling's arrest, Inv. Trammel had him transported from Spalding County Jail to the GPD for an interview.  [Doc. 111-2].  After being read his <u>Miranda</u>[18] rights, Sterling began "to ask about the charge of armed robbery and [said] there w[ere] guns but they weren[']t drawn," and when questioned about the color shirt he was wearing, he said "a white tank top," but when asked "what color before he got out of the car," Sterling said "a red shirt."  [<u>Id.</u>].

---

[18] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

GPD MPO Austin Cody Massey ("MPO Massey") submitted an affidavit and application for a search warrant for the Dodge Charger on August 16, 2019, [Doc. 96-1], which provided the following statement of probable cause:

> At the Regions Bank ATM, located at 327 W Taylor St, which is in the City of Griffin Spalding County Ga, drive through at approximately 1341 hours the crime of Armed Robbery was committed: to wit 3 black males arrived on scene in a white in color Lincoln Town car, put on ski-mask[s], and produced several guns. The weapons were used to back away the male subject that was driving the [B]rinks vehicle. The employee for [B]rinks then retreated to his truck and Police was dispatched. The 3 black male suspects who arrived on scene then took a money box from the ATM and fled the scene. Approximately a block away the males changed vehicles and then fled from the City of Griffin Ga traveling east bound on Hwy 16 E( E Taylor St). The vehicle later crashed in Henry County which was where the above mention[ed] vehicle was located and towed to the [GPD] for additional processing.

[Id. at 2]. A search warrant was issued for the Dodge Charger that same day. [Id. at 3; Doc. 111-4].

On August 21, 2019, after uncovering additional evidence from the search of the Dodge Charger, Inv. Trammel submitted an affidavit and application for a search warrant for a "Samsung cell phone with serial number R58M5735WND and IMEI number 355865/10/584859/9." [Doc. 96-2 at 1, 3]. The application sought to search for "[a]ny and all data, memory, text messages, emails, pictures, deleted files, web searches, social media accounts, stored passwords, cloud storage, notes, calendars, data, phone numbers, contact list, banking apps, videos, [and] electronic related files," as the "foregoing described property, items, articles,

instruments and person(s) to be searched for and seized constitute[d] evidence connected with [aggravated assault, possession of a firearm during the commission of or attempt to commit certain felonies, and armed robbery]" and were "designed for use in the commission of the crime(s)," were "intended for use in the commission of the crime(s)," had "been used in the commission of the crime(s)," and constituted "tangible evidence of the commission of the crime(s)[.]" [Id. at 1 (emphasis omitted); Doc. 111-5 at 1]. The probable cause statement for this application provided:

> On Friday, August 16[,] 2019[,] at approximately 1341 hours, Officers responded to Regions Bank, 327 W. Taylor St. Griffin, GA 30223 in reference to an armed robbery. Upon [the] Officers['] arrival, they learned the Brinks security guard was servicing the Regions Bank ATM when a white in color Lincoln Towncar [sic] pulled in with three black males inside. The driver of the Lincoln Towncar [sic] had a mask on and approached the ATM. The passenger of the Lincoln exited and brandished a long gun. The driver was able to steal one of the ATM[']s money trays and the three suspects fled the scene.
>
> The three suspects then abandoned the Lincoln and entered into a gray Dodge Charger that was being driven by a fourth suspect. The vehicle fled the area traveling west bound on Taylor Street at that time. Spalding County Deputies were able to locate the Dodge Charger traveling east bound on Hwy 16 and attempted to initiate a traffic stop on the Dodge Charger. The driver of the Dodge failed to stop and initiated a pursuit that went into Henry County. Officer lost the vehicle at that time but was located again in the parking lot near OB's Barbe[q]ue on Industrial Blvd in McDonough, GA. Officer also located two suspects hiding in the area, [] Sterling and [] Daniel.
>
> The two suspects were transported back to [GPD] and after being read Miranda, both admitted the[ir] involvement in the Regions ATM robbery.

26

Three ski masks were recovered from the vehicles and said masks have or will be sent to GBI for processing.  Request is made for DNA samples to be taken from the subject suspect for matching purposes.

There were also two cell phones recovered for this incident. One cell phone was located inside of the 2014 Dodge Charger.  The other cell phone located was on the person of [] Sterling.

While speaking to [Sterling], he stated another suspect with the nick name of "Smoke" information would be located in his phone. The other phone was located inside of the suspect vehicle the 2014 Dodge Charger.

[Doc. 96-2 at 2].  A search warrant for the cell phones was issued that day.  [Doc. 96-2 at 3; Doc. 111-5].

On this same day, Inv. Trammel also applied for a search warrant for a "LG Aristo 3 cell phone with serial number 902CYNL0584831 and IMEI number 352533-10-576831-5[.]"  [Doc. 168-2 at 1, 3].  The affidavit and application provided an identical probable cause statement as quoted above.  Compare [id. at 2], with [Doc. 96-2 at 2].  A search warrant was issued the same day for the LG Aristo 3 cell phone with serial number 902CYNL0584831 and IMEI number 352533-10-576831-5, [Doc. 168-1], and an Extraction Report dated August 23, 2019, indicated that a search of an LG X220 K5 cell phone took place the day before, [Doc. 168-3].

Sterling moves to suppress the evidence obtained from the searches of the Dodge Charger and his cell phone, [Doc. 96], and Daniel moves to suppress the evidence obtained from the search of his cell phone, [Doc. 167].  The government

opposes these motions, [Docs. 111 & 180], and Sterling and Daniel have filed replies in support of their respective motions, [Docs. 148 & 193].

2.    **Analysis of Sterling's Motion, [Doc. 96]**

a.    *Search of the Dodge Charger*

Sterling argues that MPO Massey, the affiant who sought the search warrant for the Dodge Charger, falsely stated that several guns had been drawn at the scene when only one gun was drawn by someone other than Sterling and that this statement was therefore recklessly made and tainted the magistrate's fair and impartial review of the affidavit, thereby requiring formal court inquiry under Franks. [Doc. 96 at 1-2]. The government responds that a Franks hearing is not warranted with respect to the search of the Dodge Charger because whether one gun or several guns were drawn during the robbery, probable cause existed for the issuance of the warrant. [Doc. 111 at 4-6]. Additionally, the government argues that Sterling lacks standing to seek suppression of any evidence found in the Dodge Charger due to abandonment. [Id. at 2 n.1].

Affidavits "supporting arrest warrants are presumptively valid," but a "defendant may challenge the validity of the government's affidavit by making a substantial preliminary showing that a false statement was included in the warrant affidavit knowingly and intentionally or with reckless disregard for the truth." United States v. Gamory, 635 F.3d 480, 490 (11th Cir. 2011) (citing Franks,

438 U.S. at 171). "If a challenged statement was necessary to support probable cause for the search, the District Court must hold an evidentiary hearing," but if "probable cause still exists once the false statement is removed from the warrant, there is no need to hold a *Franks* hearing." Id. (citations omitted). Thus, "in order to be entitled to relief a defendant must show not only that misrepresentations or omissions were intentionally or recklessly made, but also that, absent those misrepresentations or omissions, probable cause would have been lacking." United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001); see also United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006) (per curiam) (citation omitted) (explaining that under Franks, "a defendant may challenge the veracity of an affidavit in support of a search warrant if he makes a 'substantial preliminary showing' that" the affiant "deliberately or recklessly included false statements, or failed to include material information, in the affidavit;" and that "the challenged statement or omission was essential to the finding of probable cause").

"'The *Franks* standard is a high one.'" United States v. Nakouzi, No. 3:05CR154(MRK), 2005 WL 3211208, at *5 (D. Conn. Nov. 30, 2005) (quoting Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991)). Thus, "'[t]o mandate an evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine.'" Id. (alterations in original) (quoting Franks, 438 U.S. at 171); see also United States

29

v. Flowers, Case No. 12-80012-Cr-Middlebrooks/Brannon, 2012 WL 12888760, at *4 (S.D. Fla. May 23, 2012), aff'd, 531 F. App'x 975 (11th Cir. 2013) (per curiam) (unpublished) (quoting Franks, 438 U.S. at 171) ("To merit an evidentiary hearing, [d]efendant's challenge 'must be supported by more than a mere desire to cross-examine.'").

Negligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights.  See Franks, 438 U.S. at 171; Maughon v. Bibb Cty., 160 F.3d 658, 660 (11th Cir. 1998) (per curiam); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997).  Moreover, "'[i]nsignificant and immaterial misrepresentation[s] or omissions will not invalidate a warrant.'"  United States v. Maharaj, No. 07-80024-CR-CR, 2007 WL 2254559, at *7 (S.D. Fla. Aug. 2, 2007), adopted at *1 (quoting United States v. Ofshe, 817 F.2d 1508, 1513 (11th Cir. 1987)). Not every fact recited in an affidavit in support of an application for a search warrant must be exactly correct, but the affidavit must be truthful in the sense that it is believed or appropriately accepted by the affiant as true.  See Franks, 438 U.S. at 165 (explaining that "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily").

As Sterling points out, [Doc. 96 at 1 (citation omitted)], the affidavit and application for the search warrant for the Dodge Charger stated that "several

guns" were brandished during the attempted armed robbery and that "weapons" were used to back away the driver of the Brinks armored car, [Doc. 96-1 at 2]. To the extent that these statements were false,[19] Sterling has not shown that they were made "intentionally or with reckless disregard for the truth[.]" United States v. Goldstein, 989 F.3d 1178, 1197 (11th Cir. 2021) (citation and internal marks omitted). "Neither negligent mistakes nor immaterial omissions implicate Franks." Id. (citation omitted). "Moreover, a defendant's allegation of knowing or reckless falsehood must be accompanied by an offer of proof, including affidavits or other reliable statements, or a satisfactory explanation for the absence of such proof." United States v. Mobely, CRIMINAL ACTION FILE NO. 1:16-cr-145-TWT-JKL, 2017 WL 10574358, at *17 (N.D. Ga. Oct. 26, 2017), adopted by 2018 WL 5077755, at *1 (N.D. Ga. Oct. 18, 2018) (citing Franks, 438 U.S. at 171). Sterling "has not made a substantial showing that [the affiant] made a false statement[] either deliberately or with reckless disregard for the truth" that several guns, as opposed to only one, were brandished during the attempted robbery. Id. Sterling has not shown that the statement was anything more than a simple mistake, as he "fails to offer any proof or independent evidence to show that the affiant acted from bad

---

[19] The report prepared by Inv. Trammel reflects that when Sterling was interviewed by the investigators, Sterling stated that they had "guns," but that they were not drawn. [Doc. 111-2].

motive or recklessly in making the affidavit," and thus, Sterling "fails to make the requisite preliminary showing which would necessitate a <u>Franks</u> hearing, much less set forth a convincing <u>Franks</u> challenge."  <u>Flowers</u>, 2012 WL 12888760, at *4; <u>see also</u> <u>United States v. Howard</u>, No. 13-20437-CR, 2013 WL 6919725, at *2 (S.D. Fla. Oct. 22, 2013), adopted by 2013 WL 6918042, at *1 (S.D. Fla. Nov. 22, 2013) (finding that "defendant [] failed to establish his entitlement to a *Franks* hearing" since "[n]othing support[ed] a finding that the affidavit for the search warrant in this ca[]se contained deliberate falsehoods or a reckless disregard for the truth"); <u>United States v. Lebowitz</u>, 647 F. Supp. 2d 1336, 1348 (N.D. Ga. 2009), adopted at 1342, <u>aff'd</u>, 676 F.3d 1000 (11th Cir. 2012) (per curiam) ("Defendant['s ] claim . . . is pure speculation made without any offer of proof and fails the second element of the *Franks*[' ] test, that is, proof that the officer's actions were reckless or deliberate.").

In any event, the government correctly contends that "even if the words 'several' and 'weapons' were removed from the search warrant application and the word guns was made singular instead of plural, probable cause still existed to believe the Dodge Charger was involved in an armed robbery and likely to contain evidence relating to that robbery."  [Doc. 111 at 6].  "When assessing whether the alleged false statements . . . were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false and

misleading." <u>United States v. Barsoum</u>, 763 F.3d 1321, 1328-29 (11th Cir. 2014) (citation and internal marks omitted); <u>see also</u> <u>United States v. Green</u>, Case No. 8:19-cr-314-T-36TGW, 2020 WL 1983720, at *8 (M.D. Fla. Apr. 27, 2020) (citation omitted).   "The defendant bears the burden of showing that, absent those misrepresentations . . ., probable cause would have been lacking." <u>United States v. Sarras</u>, 575 F.3d 1191, 1218 (11th Cir. 2009) (citation and internal marks omitted).

"A sufficient basis for '[p]robable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" <u>United States v. Lopez</u>, 649 F.3d 1222, 1245 (11th Cir. 2011) (alteration in original) (quoting <u>United States v. Magluta</u>, 418 F.3d 1166, 1182 (11th Cir. 2005)).   "A 'fair probability,' in turn exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime." <u>Id.</u> (citation omitted).  Sterling contends that the description of "'several guns' . . . created the false impression that all defendants brandished weapons and that justification existed to authorize a search involving multiple weapons, under the pretext that the alleged criminal activity was far more sophisticated and extensive than was the case."  [Doc. 148 at 2].  However, even if the challenged language of "several guns" and multiple "weapons" were omitted from the affidavit, it would still reflect that three suspects arrived on the scene of the Regions Bank ATM in

Griffin, Georgia in a white Lincoln Town Car, put on ski-masks, and brandished a weapon that was used to back away the male subject driving the Brinks armored car; that the Brinks employee was able to retreat to his truck and police were dispatched; that the suspects took a money box from the ATM and fled the scene in the Lincoln Town Car; that the suspects switched vehicles about a block away from the Regions Bank, entering a Dodge Charger; and that the suspects then led police on a high-speed chase from Griffin into Henry County before the Dodge Charger crashed and was located in McDonough and then towed to the GPD for processing.   [Doc. 96-1 at 2].   Based on these facts, there was certainly a fair probability that instrumentalities of the armed robbery, including at least one weapon and three ski masks, among other potential evidence, along with forensic evidence, such as DNA, fibers, and fingerprints that would be useful in identifying the four suspects, could be uncovered from a search of the Dodge Charger.[20]  See United States v. Smith, 694 F. Supp. 2d 1242, 1254 (M.D. Ala. 2009), adopted at 1246, aff'd, 481 F. App'x 540 (11th Cir. 2012) (per curiam) (unpublished) (citation

---

[20] The affidavit and application for the search warrant identified the items to be searched for as including "tools and items that were used in the commission of an [a]rmed [r]obbery," as well as "forensic evidence such as DNA, Fibers, latent fingerprints, and clothing," which was to "include items taken from the scene, firearms, money, and articles of clothing to include shirts, ski-mask[s], and hats." [Doc. 96-1 at 1].

and internal marks omitted) ("Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place.").  Therefore, because these facts sufficiently establish probable cause that evidence of the crime would be found in the Dodge Charger and the representation that multiple weapons were involved in the crime was not essential to this finding, a <u>Franks</u> hearing is not warranted. <u>See</u> <u>United States v. Holstick</u>, CASE NO. 3:17-CR-223-WKW, 2018 WL 2560331, at *7 (M.D. Ala. June 4, 2018), <u>aff'd</u>, 810 F. App'x 732 (11th Cir. 2020) (per curiam) (unpublished) (concluding that defendant could not show a <u>Franks</u> violation where he failed to demonstrate that the allegedly false statement was necessary to a finding of probable cause, as redaction of the statement at issue would not have defeated the affidavit's demonstration of probable cause and thus, the statement was immaterial).  Therefore, it is **RECOMMENDED** that Sterling's motion to suppress and request for a <u>Franks</u> hearing, [Doc. 96], be **DENIED**.[21]

---

[21] The government also asserts that "Sterling does not have standing to seek the suppression of the contents of the Dodge Charger he abandoned."  [Doc. 111 at 2 n.1].  However, neither this argument nor the record is adequately developed for the Court's consideration, and it need not reach the issue since Sterling's motion is due to be denied for the reasons stated.

### b.    *Search of the Cell Phone*

Sterling argues that evidence obtained from the search of his cell phone should be suppressed because the affidavit submitted to secure the search warrant improperly sought to search "virtually anything connected with the cellular device, far beyond the expressed particularized need supposedly necessitating search of the phone," as it requested "'any and all data, memory, text messages, emails, pictures . . . cloud storage, notes, calendars, phone numbers, contact lists, banking apps, and electronic related files[.]'"   [Doc. 96 at 2 (first alteration in original)].   Additionally, he argues that the "proffered probable cause statement giving basic information about the purported robbery[] makes no reference whatsoever as to how the telephone could be expected to yield fruitful evidence or bolster the investigation, beyond making a summary statement that Sterling said he would have contact information of someone named 'Smoke' (ie [] Davis) within the telephone," and the "affiant was required to state such nexus to the telephone within the four corners of the affidavit."   [Id. at 2-3 (citations omitted)].

The government responds that the search warrant for Sterling's cell phone sufficiently established a nexus between the phone and probable cause linking him to the armed robbery conspiracy, and that the search warrant identified the items to be seized with sufficient particularly so as not to be overly broad.   [Doc. 111 at 6-15].   Additionally, the government contends that even were the search warrant

for the cell phone infirm, the evidence seized therefrom should not be suppressed based on the good faith exception to the exclusionary rule because the police executed the search warrant based on a reasonable, good faith belief that it was supported by probable cause.  [Id. at 15-17].

### i.    Particularity

"The Fourth Amendment requires that a warrant 'particularly describ[e] the place to be searched, and the persons or things to be seized.'"  United States v. Bemka Corp., 368 F. App'x 941, 943 (11th Cir. 2010) (per curiam) (unpublished) (quoting U.S. Const. Amend. IV.); see also United States v. Ellis, 971 F.2d 701, 703 (11th Cir. 1992) (citation and internal marks omitted) ("The manifest purpose of the particularity requirement of the Fourth Amendment is to prevent general searches.").  "A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad."  Bemka Corp., 368 F. App'x at 943 (citation and internal marks omitted).  "The particularity requirement allows a practical margin of flexibility, depending on the type of property to be seized, and a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit."  United Stats v. Aguirre, 368 F. App'x 979, 987 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted).

Sterling argues that the affidavit and application for the search warrant for his cell phone impermissibly sought "a general warrant authorizing search of virtually anything connected with the cellular device, far beyond the expressed particularized need supposedly necessitating search of the phone." [Doc. 96 at 2]. The government argues that "the warrant was not overly broad because it limited the scope of what could be searched and seized; and it did so with sufficient particularity to enable the searcher to reasonably ascertain and identify the things authorized to be seized," as it "was limited to evidence of armed robbery, aggravated assault and possession of a firearm during the commission of a felony and did not constitute a free-range search." [Doc. 111 at 14-15 (citations and internal marks omitted)].

The search warrant for Sterling's cell phone lists the "property, items, articles, instruments, to be searched for and seized" as including a "search of the Samsung cell phone with serial number RM58M5735WND and IMEI number 355865/10/584859/9" for "[a]ny and all data, memory, text messages, emails, pictures, deleted files, web searches, social media accounts, stored passwords, cloud storage, notes, calendars, data, phone numbers, contact list, banking apps, videos, [and] electronic related files" that were "designed for use in the commission of the crime(s) [of aggravated assault, possession of a firearm during commission of or attempt to commit certain felonies, and armed robbery]," were

"intended for use in the commission of the crime(s)," "have been used in the commission of the crime(s)," and constitute "tangible evidence of the commission of the crime(s)[.]"   [Doc. 111-5 at 1 (emphasis omitted)].   "The particularity requirement of the Fourth Amendment was satisfied here because the warrant identified the types of property authorized to be seized and indicated the crimes involved for which evidence was sought."   United States v. Conrad, No. 3:12-cr-134-J-34TEM, 2013 WL 4028273, at *9 (M.D. Fla. Aug. 7, 2013), adopted at *1 (citations omitted) (upholding a warrant that "limited the search to computer equipment, digital storage devices, and accessories that could contain contraband and evidence linked to the child pornography offenses specified in the warrant"); see also United States v. Zellner, Criminal Indictment No. 1:09-CR-320-TCB-GGB, 2011 WL 530718, at *10-11 (N.D. Ga. Jan. 14, 2011), adopted sub nom. United States v. Chester, Criminal Action File No. 1:09-cr-320-TCB-GGB, 2011 WL 529952, at *1 (N.D. Ga. Feb. 4, 2011) (finding the description of items to be seized under the warrant was not overbroad where the items described in the search warrant were reasonably linked to the crimes charged).

   "Because the description[] in the warrant[] refer[s] to items that are evidence of a violation of certain statutes relating to" aggravated assault, possession of a firearm during the commission or attempt to commit certain felonies, and armed robbery, "the items were described with sufficient particularity[.]"   Signature

<u>Pharmacy, Inc. v. Wright</u>, 438 F. App'x 741, 746 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); <u>see also</u> <u>United States v. Harvey</u>, CRIMINAL ACTION NO. 1:15-cr-00053-TWT-RGV-1, 2015 WL 9685908, at *13 (N.D. Ga. Nov. 30, 2015), adopted by 2016 WL 109984, at *1 (N.D. Ga. Jan. 8, 2016) (citations and internal marks omitted) (concluding that the warrants satisfied the particularity requirement where they "were limited to evidence of unlawful trafficking in firearms and unlawful entry of an airport in violation of security requirements and therefore did not permit a free-ranging search"); <u>United States v. Ortiz-Aleman</u>, Criminal Case No. 1:11-CR-0020-ODE-JFK, 2011 WL 3739528, at *4 (N.D. Ga. July 21, 2011), adopted by 2011 WL 3739425, at *1 (N.D. Ga. Aug. 24, 2011) (citation and internal marks omitted) (finding the warrant adequately particularized the items to be seized where it specified the items to be seized as "address and phone/contact listings, text messages send and/or received, calendars, photographs, and to-do lists, which constitutes evidence of the commission of a criminal offense and property which has been used as the means of committing a criminal offense, concerning violations of [] 21 U.S.C. §§ 841(a) and 846"). Accordingly, Sterling's motion to suppress on this basis is due to be denied.

### ii.   <u>Probable Cause</u>

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and

that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-WBH-LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd, 574 F. App'x 917 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted). That is, "[p]robable cause to search . . . requires some nexus between the [property to be searched] and the alleged crime." United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted). "Probable cause deals 'with probabilities[, which are] . . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No. 15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015), aff'd, 649 F. App'x 714 (11th Cir. 2016) (per curiam) (unpublished) (citation omitted).[22]

---

[22] "[T]he term probable cause, . . . means less than evidence which would justify condemnation. . . . It imports a seizure made under circumstances which warrant suspicion." New York v. P.J. Video, Inc., 475 U.S. 868, 876 (1986) (alterations in original) (citations and internal marks omitted). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision." Id. (citation and internal marks omitted). That is, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even

The Eleventh Circuit has explained the Court's review of the sufficiency of

a search warrant as follows:

> When called upon by law enforcement officials to determine the
> legitimacy of search warrants and their supporting affidavits, issuing
> magistrates and reviewing courts alike must strike a delicate balance
> between constitutional guarantees against excessive intrusions into
> areas of individual freedom and the Government's need to access and
> to secure relevant evidence in criminal prosecutions.  In particular,
> issuing magistrates are given the unenviable task of making "firing
> line" decisions that attempt to encourage availment of the warrant
> process while simultaneously striving to protect citizens from
> unwarranted governmental interference.   In recognition of the
> difficulty inherent in discharging this responsibility, reviewing courts
> lend substantial deference to an issuing magistrate's probable cause
> determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).  "Courts reviewing the

legitimacy of search warrants should not interpret supporting affidavits in a

hypertechnical manner[.]"  Id. at 1361 (citation omitted).  Instead, "a realistic and

commonsense approach should be employed so as to encourage recourse to the

warrant process and to promote the high level of deference traditionally given to

magistrates in their probable cause determinations."  Id. (citation omitted); see also

United States v. McCullough, Criminal Indictment No. 1:11–CR–136–JEC/AJB–01,

---

usefully, reduced to a neat set of legal rules," Gates, 462 U.S. at 232, and
"[c]ertainty has no part in a probable cause analysis," United States v. Frechette,
583 F.3d 374, 380 (6th Cir. 2009) (citation omitted).

2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014) (citations omitted).

Sterling challenges the search warrant on the grounds that the affiant failed to state a sufficient nexus between the cell phone and the probable cause. [Doc. 96 at 2-3]. Specifically, he argues that the probable cause statement gives "basic information about the purported robbery," but "makes no reference whatsoever as to how the telephone could be expected to yield fruitful evidence or bolster the investigation, beyond making a summary statement that Sterling said he would have contact information of someone named 'Smoke' (ie [] Davis)[.]" [Id. at 2 (citation omitted)]. The government responds that based on the totality of the circumstances, "probable cause existed to show the requisite nexus between the armed robbery the police investigated and the Samsung cell telephone the police found on Sterling." [Doc. 111 at 11].

The affidavit in support of the search warrant application for Sterling's cell phone provided a probable cause statement establishing that on August 16, 2019, a Brinks security guard was servicing the Regions Bank ATM in Griffin, Georgia, when a white Lincoln Town Car approached with three black males inside; that the driver, who was wearing a mask, approached the ATM and was able to steal one of the money trays from an ATM while the passenger brandished a long gun; that the suspects then fled the scene; that the suspects abandoned the Lincoln

43

Town Car and entered a gray Dodge Charger that was being driven by a fourth suspect; the Dodge Charger then fled the area and was pursued by police into Henry County, where the officers lost the vehicle; that the Dodge Charger was ultimately located in a parking lot near OB's Barbeque in McDonough; that two suspects, one of whom was Sterling, were located hiding in the area; that Sterling and the other apprehended suspect were transported to the GPD, where they were read their Miranda rights and made statements admitting their involvement in the Regions ATM robbery; that two cell phones were recovered, one of which was found in the Dodge Charger while the other was found on Sterling's person; and that during Sterling's interview at the GPD, he identified another suspect that went by the nickname of "Smoke" and stated that the contact information for this person was located in his cell phone.  [Doc. 96-2 at 2].

Considering the totality of these circumstances, the Court finds that there was a fair probability that evidence of the crime would be found in Sterling's cell phone.  Lopez, 649 F.3d at 1245 (citation omitted).  First, while Sterling attempts to downplay his statement that Smoke's contact information was contained on his phone, see [Doc. 96 at 2], it is certainly significant to this analysis that he explicitly informed the investigators that his cell phone contained evidence pertaining to the crime, namely, the identity of another perpetrator, as well as possible communications between Sterling and Smoke regarding the crime, see United

States v. Matthews, CRIMINAL CASE NO. 1:19-cr-00221-TWT-RGV, 2020 WL 1539941, at *6 (N.D. Ga. Feb. 21, 2020), adopted by 2020 WL 1534745, at *1 (N.D. Ga. Mar. 27, 2020) ("Officers had probable cause to search the [] phone[] in an effort to identify the other suspects of the armed robbery who had not been apprehended.").  Moreover, given the information that the suspects fled the scene in a Lincoln Town Car and later met up with another suspect driving a Dodge Charger and continued to flee in that vehicle, leaving behind the Lincoln Town Car, there was a fair probability that the suspects in the Lincoln Town Car had communicated with the driver of the Dodge Charger by cell phone in order to coordinate their locations and seamlessly switch vehicles to evade police.  The Supreme Court has recognized that "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." Riley v. California, 573 U.S. 373, 401 (2014).  "Indeed, it takes no special expertise for a judge to infer that information related to an active criminal enterprise may be contained on a cell phone."   United States v. Kendricks, CRIMINAL ACTION FILE NO. 1:15-CR-400-MHC-AJB, 2016 WL 5952743, at *7 (N.D. Ga. Oct. 13, 2016), aff'd, 723 F. App'x 950 (11th Cir. 2018) (per curiam) (unpublished) (citations omitted).  Moreover, the "affidavit provided ample facts to indicate that [Sterling] participated in the robbery," as it stated that Sterling

admitted to his involvement and identified a co-conspirator by his nickname. United States v. Brewer, Criminal No. 1:13-CR-13-03, 2015 WL 2250150, at *4 (M.D. Pa. May 12, 2015); see also [Doc. 96-2 at 2].

Thus, the evidence identified in the affidavit "created a substantial basis for the magistrate to find probable cause to search [Sterling's] phone." Brewer, 2015 WL 2250150, at *4 (citation omitted) (finding "it would have been reasonable for the magistrate to infer that information related to [defendant's] presence at the robbery would be found in the phone."); see also Matthews, 2020 WL 1539941, at *6 (explaining that the detailed information provided in the affidavit was more than sufficient to establish probable cause that evidence of the armed robberies would be found on cell phones that were "discovered in a vehicle abandoned by defendant and two other suspects in an armed robbery," as the officers had probable cause to search the phones in an effort to identify other suspects that had not yet been apprehended); United States v. Kendricks, CRIMINAL ACTION NO. 1:15-CR-400-MHC/AJB, 2016 WL 11440141, at *14 (N.D. Ga. Aug. 22, 2016), adopted by 2016 WL 5952743, at *8, aff'd, 723 F. App'x at 954 (concluding that "the warrant was supported by an adequate nexus between the cell phone and [the violent gang activity] under investigation" where the "affidavit showed that [defendant] was a gang member, he was in a vehicle with another gang member, [] his gang was in a retaliatory dispute with another gang," and the "vehicle from

which he fled contained the cell phone[] along with a .40 caliber handgun and an AK-47 assault rifle"). Therefore, Sterling's motion to suppress is due to be denied on this basis as well.[23] Accordingly, it is **RECOMMENDED** that Sterling's motion to suppress, [Doc. 96], be **DENIED** as to the search of his cell phone.

---

[23] Furthermore, as the government points out, [Doc. 111 at 15], even if the search warrant for Sterling's cell phone was deficient, any evidence obtained pursuant to the warrant was based upon a reasonable reliance on the warrant's validity and would therefore not be subject to the exclusionary rule. See Leon, 468 U.S. at 926; United States v. Martin, 297 F.3d 1308, 1313–17 (11th Cir. 2002) (good faith exception applied where "the affidavit contained sufficient indicia of probable cause to enable a reasonable officer to execute the warrant thinking it valid" and where the issuing judge "did not cross the line and wholly abandon his judicial role"). "In the Eleventh Circuit, the good faith exception to the exclusionary rule applies to alleged violations of the particularity requirement." Ortiz-Aleman, 2011 WL 3739528, at *6 (citing United States v. Accardo, 749 F.2d 1477, 1479 (11th Cir. 1985)); see also United States v. Travers, 233 F.3d 1327, 1330 (11th Cir. 2000) (citation omitted) ("The good faith exception may be applied to a search conducted pursuant to an overly broad warrant."). Sterling "maintains that the exceptions under Leon[] preclude the good-faith exception from being applicable here," arguing again that the "affidavit as written makes no showing within of probable cause that the cell phone content would further the investigation" and that the affidavit lacked particularity. [Doc. 148 at 5 (emphasis omitted)]. The Court disagrees and finds that none of the circumstances precluding the good faith exception apply here. There is no allegation that false information was included in the affidavit, and there is nothing in the record that even hints that the magistrate who reviewed the affidavit and signed the search warrants engaged in any misconduct or abrogation of judicial responsibility, and as already discussed, the affidavit set forth sufficient probable cause, and in any event is not "so lacking . . . as to render official belief in its existence entirely unreasonable." Martin, 297 F.3d at 1313 (citation and internal marks omitted). Moreover, as discussed, the warrant is facially valid in that it describes in sufficient detail the cell phone to be searched and the items to be seized, as the items described were reasonably linked

### 3.    Analysis of Daniel's Motion, [Doc. 168]

Daniel moves to suppress any and all evidence obtained as a result of the search of his cell phone, [Doc. 168], because the search warrant was for an LG Aristo 3 phone, not the LG X220 K5 that belonged to him, and because the affidavit in support of the warrant failed to establish proof that evidence pertaining to the attempted robbery would be found on the phone, as it merely stated that the phone was found in the Dodge Charger without providing any information linking the phone to any suspects or indicating that the suspects communicated using phones, [id. at 4-5].  The government responds that despite the error in identifying the LG X220 K5 as an LG Aristo 3 phone, the search warrant described the cell phone as an LG model with the correct serial number and IMEI number and thus was sufficiently particular to ensure that the police searched the correct phone.  [Doc. 180 at 2-3].  The government also argues that the search warrant established a sufficient nexus between the cell phone and the probable cause linking Daniel to

---

to the crimes charged.  See [Doc. 111-5]; see also Travers, 233 F.3d at 1330 (citation omitted) (finding warrant "was not 'so facially deficient—i.e., failing to particularize the place to be searched or the things to be seized — that the executing officers could not have reasonably presumed it to be valid'"); Zellner, 2011 WL 530718, at *10-11.  Accordingly, the law enforcement agents executing the warrant were justified in believing in its validity, and evidence seized during the execution of the cell phone warrant would not be subject to suppression under the good faith exception even were the warrant found to lack probable cause or sufficient particularity.  See Massachusetts v. Sheppard, 468 U.S. 981, 989-90 (1984).

the attempted robbery of the Brinks armored car.  [Id. at 4-10].  Finally, the government notes that Daniel lacks standing to challenge the search of his phone as he abandoned it in the Dodge Charger.  [Id. at 11 n.1].  In reply, Daniel argues that probable cause for the search of his phone was lacking as "there was no reason to infer that information related to the attempted armed robbery would be on [his] phone," and thus "there was an insufficient nexus between the phone and the attempted robbery and a warrant should not have been issued."  [Doc. 193 at 2-3].  He also argues that the government has not put forth any evidence that he voluntarily abandoned his phone.  [Id. at 3 (citation omitted)].[24]  The Court will discuss each of these arguments.

a.   *Particularity*

As previously discussed, the Fourth Amendment requires that search warrants particularly describe the place to be searched and the things to be seized. Tillis v. Blanks, CIVIL ACTION NO. 2:15-333-CG-C, 2017 WL 89570, at *12 (S.D.

---

[24] Daniel had also originally moved to suppress "any and all evidence obtained as a result of the search of his cell phone, both with or without a search warrant," as he was not sure whether "there [was] a separate search warrant for the LG X220 K5 or if the affidavit and warrant misidentified the phone as a[n] LG Aristo 3," [Doc. 168 at 1-2], but in his reply brief, he noted that based on his review of "the LG phone that was seized by law enforcement," he was withdrawing "the first part of his motion insofar as he contended the phone was searched without a warrant," [Doc. 193 at 1 (citation omitted)].

Ala. Jan. 10, 2017) (citation omitted).  In discussing the particularity requirement

for search warrants, the Eleventh Circuit has made clear:

> A warrant's description of the place to be searched is not required to meet technical requirements or have the specificity sought by conveyancers.  The warrant need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority.  An erroneous description of premises to be searched does not necessarily render a warrant invalid.  The Fourth Amendment requires only that the search warrant describe the premises in such a way that the searching officer may with reasonable effort ascertain and identify the place intended.

United States v. Burke, 784 F.2d 1090, 1092 (11th Cir. 1986) (citation and internal

marks omitted).

The government concedes that the search warrant for Daniel's cell phone

incorrectly described it as an LG Aristo 3 instead of an LG X220 K5, but argues that

this error "is not fatal because the search warrant accurately described the cell

phone as an LG cell phone with serial number 902CYNL0584831 and IMEI number

352533-10-576831-5," which "is sufficiently particular to ensure that the police

searched the correct cell phone."  [Doc. 180 at 2 (emphasis omitted)].  In reply,

Daniel does not dispute the accuracy of the other identifying information

contained in the warrant and, without specifically responding to the government's

particularity arguments, see [Doc. 193], he "maintains that the search of the LG phone, even with a warrant, was unconstitutional," [id. at 1].[25]

The Court agrees with the government that because the search warrant correctly identified the phone to be searched as an LG model phone with the correct serial number and IMEI number, the investigators executing the warrant were able to reasonably ascertain the identity of the phone to be searched with little risk of searching the wrong phone.  See [Doc. 168-2 at 1].  Indeed, as the government points out, [Doc. 180 at 3 (citation omitted)], the Eleventh Circuit has consistently upheld the validity of search warrants containing description discrepancies where there was still sufficient information to allow the place to be searched to be correctly identified, see, e.g., United States v. Graham, 476 F. App'x 839, 841 (11th Cir. 2012) (per curiam) (unpublished) (explaining that even though the search warrant listed the wrong address for the apartment, it "still identified his apartment with sufficient particularity to satisfy the Fourth Amendment in light of the inclusion in the warrant of the correct street address to be searched and an accurate description of the residence"); Burke, 784 F.2d at 1092-93 (citation omitted) (concluding that the "search warrant described the premises to be searched with sufficient particularity to direct the officers to the correct apartment,

---

[25] Thus, Daniel appears to have abandoned his arguments as to particularity, see generally [Doc. 193], but the Court will address them nonetheless.

to confine the officers' examination to that apartment, and to place the occupants on sufficient notice of the officers' authority to search the premises" where the search warrant named the wrong street for the apartment address but provided the correct apartment number and a "detailed physical description of the building, minimizing the possibility that an apartment in any building other than the correct one would be searched").

The information contained in the affidavit and application for the search warrant "was sufficiently particular for the [investigators] to reasonably ascertain and identify the property that was authorized to be searched."  United States v. Sandiford, 5:21-cr-1-JA-PRL, 2021 WL 2689773, at *2 (M.D. Fla. May 4, 2021), adopted by 2021 WL 2688715, at *1 (M.D. Fla. June 30, 2021) (footnote and citation omitted) (rejecting defendant's argument that the search warrant for the cell phone failed to meet the particularity requirement where, even though the precise type of phone was unknown, it was described as "'a cellular telephone assigned the unique call number of (352) 364-1308, in the possession of [defendant],'" which was sufficiently particular for the agents to reasonably ascertain and identify the property to be searched); see also United States v. Russian, No. 14-10018-01-EFM, 2015 WL 1863333, at *7 (D. Kan. Apr. 23, 2015) (footnote omitted) (concluding that the search warrant "enable[d] the searcher to reasonably ascertain and identify the things authorized to be seized" with sufficient particularity where it "provide[d]

a physical description of each phone and set[] forth their serial numbers"); cf. United States v. House, Criminal Action Nos. 09-273-03, 10-021-02, 2015 WL 4111457, at *21 (W.D. Pa. July 8, 2015) (citation and internal marks omitted) (noting that a cell phone "can be sufficiently identified by such features as its telephone number, electronic serial number[, ] or international mobile subscriber identity number"); United States v. Flores, No. 1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *2 (N.D. Ga. Sept. 27, 2007) (finding the wiretap orders that identified the phones "by telephone number and International Mobile Subscriber Identity Number, which is sufficiently similar to an electronic serial number to permit reliable identification," identified the phones "with sufficient particularity to satisfy the law"). Accordingly, Daniel's motion to suppress on this basis is due to be denied.

### b. *Probable Cause*

As previously discussed, the "Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested," Batancourt, 734 F.2d at 754 (citation omitted), and "[p]robable cause to search . . . requires some nexus between the [property to be searched] and the alleged crime," Joseph, 709 F.3d at 1100 (citation omitted). "A sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a

particular place." United States v. Hodivsky, CRIMINAL ACTION 19-00080-KD-N, 2019 WL 2571248, at *2 (S.D. Ala. June 21, 2019) (citation and internal marks omitted).

Daniel argues that the affidavit in support of the search warrant application failed to "provide any information linking the phone to any of the suspects or even indicate that the suspects communicated using phones," as it merely "state[d] that the phone was found in the Dodge Charger."  [Doc. 168 at 5].  The government argues that the totality of the circumstances set forth in the search warrant application establish a sufficient nexus between Daniel's cell phone and the attempted armed robbery.  [Doc. 180 at 6].  The Court agrees with the government.

The probable cause statement in the affidavit and application for the search warrant provided the following pertinent information: on August 16, 2019, while a Brinks security guard was servicing the Regions Bank ATM in Griffin, a white Lincoln Town Car approached with three black males inside; the driver of the Lincoln Town Car, who was masked, approached the ATM, while a passenger exited the vehicle and brandished a long gun; the driver was able to steal a money tray from the ATM; the three suspects fled the scene in the Lincoln Town Car, which they later abandoned and entered a gray Dodge Charger, which was being driven by a fourth suspect; the Dodge Charger fled the area and was eventually pursued by police, but investigators lost the vehicle during the pursuit and

ultimately located it in a parking lot near OB's Barbeque in McDonough; officers

located two suspects, one of whom was Daniel, hiding in the area in McDonough;

that Daniel and the other apprehended suspect were transported to the GPD and

after being advised of their <u>Miranda</u> rights, both admitted their involvement in the

robbery;[26] two phones were recovered from this incident; the phone for which a

search warrant was sought was located inside the Dodge Charger; the other cell

was found on the person of the other suspect, Sterling, who stated during

questioning that the contact information of another person involved in the robbery

could be found in his phone; and "[a]t this time[,] there is probable cause to believe

information is contained on the cell phones of the suspects[.]"  [Doc. 168-2 at 2].

The affidavit submitted to secure the search warrant for Daniel's cell phone

demonstrated that at least four individuals were involved in the Regions Bank

---

[26] Daniel insists that "[i]t is not enough to establish that . . . a co-defendant admitted to being involved in the robbery," and notes that while the affidavit stated that both Sterling and Daniel admitted involvement in the robbery, Daniel "did not admit to participating in the robbery."  [Doc. 193 at 2 & n.1].  However, as will be discussed with respect to Davis' motion to suppress statements, Sterling's "statements are entitled to an inference of reliability given the circumstances under which they were made, that is, by [a] known participant[] in the alleged criminal offense," <u>United States v. Prudente</u>, CRIMINAL ACTION FILE 1:05-CR-324-CAP, 2006 WL 8440223, at *7 (N.D. Ga. July 19, 2006), adopted by 2006 WL 8440220, at *1 (N.D. Ga. Aug. 28, 2006) (citations omitted), and "uncorroborated testimony from an admitted accomplice is sufficient to support probable cause, unless it is incredible or contradicts known facts to such an extent no reasonable officer would believe it," <u>Damali v. City of E. Point</u>, 766 F. App'x 825, 827 (11th Cir. 2019) (per curiam) (unpublished) (citation and internal marks omitted).

ATM robbery, as three suspects arrived on the scene in the Lincoln Town Car and then a fourth suspect driving the Dodge Charger met up with them at another location. See [id.]. It is reasonable to assume that the suspects would have communicated by telephone to coordinate a location to meet and switch vehicles, especially since the cell phone at issue was found inside the Dodge Charger switch car. This inference is bolstered by the fact that Sterling admitted to having the contact information of another person involved in the robbery, which suggests that the perpetrators may have communicated by phone when coordinating the plan to commit the robbery and therefore, it follows that similar information, including contact information for other suspects or communications relating to the robbery, could be contained in Daniel's phone. See Matthews, 2020 WL 1539941, at *6 (concluding that there was probable cause to search cell phones that had been found in an abandoned vehicle after an armed robbery "in an effort to identify the other suspects of the armed robbery who had not been apprehended"); Kendricks, 2016 WL 11440141, at *14 (concluding that "probable cause existed to show the requisite nexus between the violent gang activity being investigated . . . and [defendant's] cell phone" where the affidavit showed that defendant was a gang member, defendant was in a vehicle with another gang, their gang was in retaliatory dispute with another gang, and the phone was found in the vehicle from which defendant fled, and since both defendant and the other gang member

56

"possessed cell phones, given these circumstances, it was likely that, at a minimum, evidence that they communicated with each other and others about the rivalry and possible retaliatory acts, including acts of retaliation that had already occurred, would be contained on [defendant's] cell phone").

As previously noted, cell phones are "important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals," Riley, 573 U.S. at 401, and "it takes no special expertise for a judge to infer that information related to an active criminal enterprise may be contained on a cell phone," Kendricks, 2016 WL 5952743, at *7 (citations omitted). Therefore, the Court finds "that a substantial basis existed for the magistrate to conclude there was a fair probability evidence of the robbery would be found in [Daniel's] phone." Brewer, 2015 WL 2250150, at *5; see also Matthews, 2020 WL 1539941, at *6 (citations omitted) (finding the information contained in the affidavit was sufficient to establish probable cause that evidence of the armed robberies would be found on the cell phones where the cell phones were discovered in a vehicle abandoned by defendant and two other suspects in an armed robbery). Therefore, Daniel's motion to suppress fails on this basis as well,[27] and it is

_____

[27] The government also argues that Daniel "abandoned both the Dodge Charger and his cellular telephone" and thus, "he has not shown that he has standing to

**RECOMMENDED** that Daniel's motion to suppress evidence obtained as of the result of a search of his cell phone, [Doc. 168], be **DENIED**.

**E.    Motions to Suppress Statements, [Docs. 91 & 95]**

    **1.    Davis' Motion to Suppress Statements, [Doc. 91]**

Davis moves to suppress statements he made during a post-arrest interview on September 12, 2019.  [Doc. 91].  He argues that his statements are due to be suppressed because there was no probable cause to arrest him, he did not knowingly and voluntarily waive his <u>Miranda</u> rights, and he invoked his right to have an attorney present during the interview and therefore, all subsequent questioning was improper.  [Doc. 222 at 9-19].  In response, the government argues that probable cause existed for Davis' arrest; that he voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights; and that his initial ambiguous mention of an attorney did not require the agents to cease questioning, and once Davis did unambiguously request counsel, the investigators properly ceased questioning

---

challenge the search here."   [Doc. 180 at 11 n.1].  Daniel responds that "the government summarily states that [ he] abandoned his cell phone and has not shown standing," and although "[i]t is not clear that the government adequately raised this issue," assuming that it has, "the government has not put forth any evidence that [ he] voluntarily discarded, left behind, or otherwise relinquished his interest in the phone."  [Doc. 193 at 3 (citations and internal marks omitted)]. Because neither the argument nor the record is adequately developed to address the government's abandonment argument, the Court need not reach it, particularly since Daniel's motion is due to be denied for the reasons stated.

and only continued upon Davis' re-initiation.  [Doc. 233 at 6-16].  The Court will address each of these arguments in turn.

      **a.**     *Statement of Facts*

As part of his investigation of the attempted armed robbery of the Brink's armored car in Griffin, Georgia, that occurred on August 16, 2019, GPD Inv. Trammel spoke with witnesses in the area, including the Brinks employee who was the target of the attempted robbery and obtained video surveillance footage from nearby businesses, which he used to ascertain whether vehicles were used by the perpetrators.  (Davis Tr. at 6-8).  By viewing the surveillance footage, Inv. Trammel determined that the perpetrators fled the scene of the attempted robbery in a white Lincoln Town Car, which they subsequently abandoned and switched to a gray Dodge Charger.  (Davis Tr. at 8).  The Dodge Charger was involved in a high-speed chase into Henry County, Georgia, where it eluded law enforcement officers until it was found in the parking lot of OB's Barbeque restaurant in McDonough.  (Davis Tr. at 67).  Two of the defendants, Daniel and Sterling, subsequently were located and arrested in McDonough and transported to the GPD.  (Davis Tr. at 35-36, 40-41, 65-67).

Inv. Trammel interviewed Sterling after he was apprehended, and he admitted to being involved in the attempted robbery along with five other participants, one of whom he identified by the nickname of "Smoke."  (Davis Tr.

at 10-11, 38).  Sterling did not disclose Smoke's real name but stated that Smoke's contact information could be found in his cell phone.   (Davis Tr. at 11, 39). Investigators subsequently obtained a search warrant for Sterling's cell phone and upon searching it were able to determine that Smoke was Davis.  (Id.).[28]  Sterling's phone also revealed text messages between Sterling and Davis during the relevant timeframe, which included texting about getting together on August 16th, the date of the attempted robbery.  (Davis Tr. at 64-65); see also [Doc. 114 at 5-6, 8-9].  The investigators also obtained video footage from the Best Western Hotel located in McDonough, Georgia, near where the Dodge Charger was ultimately found,[29] which showed Davis inside the hotel with co-defendant Butler.  (Davis Tr. at 32, 40, 65).

Davis was arrested at work on September 12, 2019, and transported to the Atlanta Police Department ("APD") headquarters, where he was interviewed by

---

[28] The investigators did not know that Davis was involved until they obtained this information from Sterling.  (Davis Tr. at 39).  There was only one contact for a person named Smoke in Sterling's phone.  (Id.).  The investigators were able to search Sterling's phone and ascertain Smoke's identity as Davis before he was arrested.  (Davis Tr. at 69-70).

[29] Davis points out that the Dodge Charger was found near OB's Barbeque restaurant, (Davis Tr. at 67), which he asserts was approximately half a mile from the Best Western, according to a search on Google maps, [Doc. 237 at 4 n.1 (citations omitted)].  Another co-defendant, Daniel, was located and arrested near a dumpster behind the Best Western on the day of the attempted robbery.  (Davis Tr. at 67).

Inv. Trammel and GPD Investigator Carey Jackson ("Inv. Jackson"), along with

FBI Special Agent Josh Floyd ("Agent Floyd").  (Davis Tr. at 12, 28, 31, 44).  Davis

was a convicted felon and was on parole at the time of the interview.  (Davis Tr. at

29-30).  At the outset of the interview, Inv. Trammel informed Davis that they were

there to talk to him about an incident that occurred in Griffin, Georgia, and read

him his Miranda rights.  (Davis Tr. at 12, 47-48; Davis Gov't Ex. 1 at 1:20:58-1:23:00).

Inv. Trammel began reviewing the Miranda Waiver Certificate by asking Davis

his name, age, current address, and how many years of school he completed.

(Davis Gov't Ex. 1 at 1:21:13-1:21:45); see also (Davis Gov't Ex. 2).  Next, Inv.

Trammel explained that he was going to read Davis each of his rights and ask

whether he understood them, and he then proceeded to read off every right and

after each one, Inv. Trammel paused and asked Davis if he understood, and Davis

nodded his head each time, indicating that he did understand.  (Davis Gov't Ex. 1

at 1:21:46-1:22:08).  Inv. Trammel next instructed Davis to print his name, date of

birth, and phone number on the Waiver Certificate, sign at the bottom, and initial

next to each right to indicate that they were read to him and that he understood

what was read to him, and Davis did so.  (Davis Gov't Ex. 1 at 1:22:09-1:23:00).

Inv. Trammel then initiated questioning by explaining that there was an incident

in Griffin, that they had arrested several individuals for it, and that they wanted

to learn more about what happened and how he was involved.  (Davis Gov't Ex. 1 at 1:23:01-1:23:28).

Davis initially spoke freely to the investigators.  (Davis Tr. at 13).  At one point, Davis asked the investigators if he was going to jail for what the other suspects were saying about him, and Inv. Trammel explained that he was being charged based on what the others involved had said, which was why they wanted to talk to him to learn more about his involvement.  (Davis Gov't Ex. 1 at 1:29:40-1:29:55).  A few minutes later, after Inv. Trammel continued asking questions about the incident in Griffin, Davis paused and asked whether he was going to need a lawyer, and Inv. Trammel responded, "That's up to you."  (Davis Gov't Ex. 1 at 1:33:55-1:34:15).  Inv. Trammel then explained that he could not advise Davis one way or the other, but that if he wanted to have a lawyer present, that was his right.  (Davis Gov't Ex. 1 at 1:34:18-1:34:30).  Davis asked the investigators if he could have a cigarette break, which they provided him.  (Davis. Gov't Ex. 1 at 1:34:31-1:43:20).  The investigators did not discuss the case or whether Davis wanted a lawyer during the cigarette break.  (Davis Tr. at 62-63).

After his cigarette break, Davis re-initiated the conversation by saying that he would tell them what he knew but stated that he thought he would prefer to have a lawyer there, and he asked the investigators how long it would take to get a lawyer, as he did not want to be there all day, and Inv. Trammel explained that

they could not get him a lawyer that day.  (Davis Tr. at 21-22; Davis Gov't Ex. 1:43:31-1:43:47).[30]  Davis stated that if he was going to be incriminating himself, he would rather have a lawyer present, and Inv. Trammel told him that was his right and that if he was asking for a lawyer, the investigators would need to leave and could not ask him any more questions, adding that he was unsure when there would be another opportunity to speak with them.  (Davis Gov't Ex. 1 at 1:44:07-1:44:32).  Davis inquired whether the investigators were asking him questions in order to see what charges to bring against him, and Inv. Trammel responded that Davis had already been charged and that they were trying to figure out exactly how he was involved, explaining that Davis had been charged with armed robbery, aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a crime.  (Davis Tr. at 22; Davis Gov't Ex. 1 at 1:44:33-1:45:04).

Inv. Trammel then re-affirmed that if Davis was requesting a lawyer, the interview would need to end, and he asked Davis if he wished to have a lawyer present before he continued talking to them or if he wished to answer questions without a lawyer.  (Davis Gov't Ex. 1 at 1:45:04-1:45:17).  Davis responded that

---

[30] Inv. Trammel believed that they could not provide him an attorney at that time because he needed appointed counsel, but the charges brought against him were in the Griffin Judicial Circuit in Spalding County, and the interview was taking place in Atlanta, which was at least an hour away by car.  (Davis Tr. at 53, 61-62).

there were certain questions for which he would prefer to have a lawyer present, and Inv. Trammel prepared to conclude the interview, stating that he could not continue to talk to Davis, and he told Davis to talk to his lawyer if he would like to speak with the investigators again.  (Davis Tr. at 24; Davis Gov't Ex. 1 at 1:45:17-1:45:44).  Davis then stated that the investigators could ask him questions, but that he would refuse to answer some of them according to his own judgment, and Inv. Trammel asked Davis whether he was willing to talk to them without a lawyer present and whether he understood that he had the right to have a lawyer present but that he wished to answer some questions without a lawyer, and Davis responded in the affirmative to each question.  (Davis Tr. at 24-25; Davis Gov't Ex. 1 at 1:45:45-1:46:13).[31]  The investigators then proceeded to ask Davis questions, and at one point when the investigators began asking him about another robbery that had taken place, Davis responded that this was a subject for which he wanted to have a lawyer present, but he asked the investigators whether there was anything else they wanted to ask him, and the interview proceeded.  (Davis Tr. at 25-26; Davis Gov't Ex. 1 at 1:49:22-1:50:25).  Davis moves to suppress statements

---

[31] Inv. Trammel testified at the evidentiary hearing that the procedure he follows when a suspect asks for a lawyer is to end the interview immediately, but when a suspect is unsure about whether they want to have a lawyer present, he explains their rights to them again, and that is what he did in this case.  (Davis Tr. at 27-28).

he made during the interview, [Doc. 91], and the government opposes his motion, [Doc. 233].

        **b.**    *Analysis*

           **i.**    <u>**Probable Cause**</u>

Davis first argues that the government has failed to demonstrate that there was probable cause to arrest him as "there was insufficient evidence to establish that [ he] participated in the attempted armed robbery and other crimes committed in Griffin on August 16, 2019." [Doc. 222 at 9]. Although he admits that "Sterling said a person named 'Smoke' was involved," he contends that "prior to [] Davis' arrest and interrogation, there was no evidence that Davis was known as 'Smoke,' or that he was *the person* Sterling knew as 'Smoke,'" as "Sterling did not identify [] Davis from the Best Western video and say this person was involved in the Griffin robbery" and "[o]nly Inv[.] Trammel jumped to this conclusion." [<u>Id.</u> at 9-10]. Davis adds that "there is no evidence or reasonable belief that there is only one person known as 'Smoke' in the Northern District of Georgia," and that in any event, "Sterling was by no means a proven reliable source of information" as accomplice confessions are presumptively unreliable and therefore, corroboration was required to arrest Davis, but the only corroboration Inv. Trammel could provide was the Best Western video, which merely depicted Davis as being present in the same hotel with another suspect at an unknown time and under

unknown circumstances.   [Id. at 10-13 (citation omitted)].   The government responds that there was sufficient probable cause to arrest Davis "based on his codefendant [] Sterling's statements against penal interest that identified Davis as his coconspirator," which was corroborated by "video surveillance film at the Best Western Hotel where the Dodge Charger switch car was found,"[32] which "established that Davis was there with co-defendant [] Butler."  [Doc. 233 at 6-8 (footnote and citations omitted)].

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime."  United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (citation and internal marks omitted).  "This does not require an actual showing of criminal activity, but 'only a probability or substantial chance of criminal activity.'"  United States v. Roberts, 410 F. Supp. 3d 1268, 1281 (N.D. Fla. 2019) (quoting Gates, 462 U.S. at 243 n.13). The "probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances."  Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007) (citing Maryland v. Pringle, 540 U.S.

---

[32] As Davis correctly points out, [Doc. 237 at 4], the Dodge Charger was actually found in the parking lot of OB's Barbeque, not at the Best Western Hotel, see (Davis Tr. at 67).

366, 370 (2003)).  "Whether probable cause exits depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  Devenpeck v. Alford, 543 U.S. 146, 152 (2004) (citation omitted).  The Court applies a totality of the circumstances approach in determining whether probable cause existed.  See Gates, 462 U.S. at 238 (citations omitted); United States v. Hairston, Criminal Case No. 1:13-CR-199-1-ODE, 2014 WL 462480, at *5 (N.D. Ga. Feb. 5, 2014) (citation omitted).

In this case, prior to arresting Davis, investigators had arrested and interviewed co-defendant Sterling, who stated that there were five participants involved in the attempted robbery and that two other people, one of whom was nicknamed "Smoke," rode with him in the Lincoln Town Car, which was used to flee the scene after the attempted robbery.  (Davis Tr. at 8, 10-11, 38-39); see also [Doc. 114 at 6].  Sterling stated that Smoke's contact information was in his phone and once the investigators obtained a warrant and searched Sterling's phone, they identified Smoke as a contact and determined that Smoke was Davis.  (Davis Tr. at 11, 39).  There was only one individual named Smoke in Sterling's phone.  (Davis Tr. at 39).  While Davis insists that prior to his arrest, there was no evidence that Davis was known as Smoke or that he was the person Sterling knew as Smoke, [Doc. 222 at 9-10], this contention is incorrect, as Inv. Trammel testified that the investigators were able to interview Sterling, search his phone, found the sole

contact for a person named "Smoke" in Sterling's phone, and identified Davis through the phone number listed in Sterling's contacts as Smoke and video surveillance that depicted Davis in the company of co-defendant Butler in the Best Western Hotel in McDonough near where the Dodge Charger switch car was found prior to arresting Davis, (Davis Tr. at 39, 69-70).[33]

"[W]hile under certain circumstances, a confession of an accomplice might not establish probable cause for an arrest under the 'totality of the circumstances' test derived from . . . *Gates*, . . . there is no per se rule against using such uncorroborated confessions as the basis of probable cause[.]" Pitts v. Bullard, No. 3:04-cv-595-TH, 2007 WL 177785, at *1 (M.D. Ala. Jan. 23, 2007) (citations omitted) (rejecting the argument that "probable cause for an arrest cannot be based on the uncorroborated confession of an accomplice"). Rather, "[o]rdinarily, unless it is incredible or contradicts known facts to such an extent no reasonable officer would believe it, a co-defendant's confession that he and the suspect committed the crime can supply probable cause to arrest the suspect." Craig v. Singletary, 127 F.3d 1030, 1045-46 (11th Cir. 1997); see also id. at 1045 ("It would be anomalous for us

---

[33] Davis complains that Inv. Trammel did not explain how he identified him as Smoke from the phone number listed in Sterling's contacts, but his counsel had the opportunity to cross-examine Inv. Trammel on this point at the evidentiary hearing on his motion to suppress and did not ask him to elaborate on his explanation that he identified Davis through the number found in Sterling's phone and the Best Western video surveillance. See (Davis Tr. at 39-41, 69-71).

to hold that even though a codefendant's uncorroborated testimony can prove guilt beyond a reasonable doubt, the confession of a co-defendant that he and the suspect committed the crime is insufficient to establish probable cause."); cf. Damali, 766 F. App'x at 827 (citation and internal marks omitted) ("[L]ongstanding [Eleventh C]ircuit precedent is clear that uncorroborated testimony from an admitted accomplice is sufficient to support probable cause, unless it is incredible or contradicts known facts to such an extent no reasonable officer would believe it.").

Davis argues that Sterling's incriminating statements required corroboration, but the precedent he cites on this point discusses the reliability of anonymous tips, not co-defendant confessions.  See [Doc. 222 at 11-12 (citation omitted)].  The "standard is different for one who allegedly knows information about a defendant's involvement in a crime . . . and one[] who was an accomplice in the crime facing punishment."  Strolis v. Heise, CV 118-137, 2020 WL 1492170, at *9 (S.D. Ga. Mar. 23, 2020), aff'd, 834 F. App'x 523 (11th Cir. 2020) (per curiam) (unpublished).  Sterling's "statements are entitled to an inference of reliability given the circumstances under which they were made, that is, by [a] known participant[] in the alleged criminal offense."  Prudente, 2006 WL 8440223, at *7 (citations omitted).  His admission of his involvement in the attempted armed robbery was "directly adverse to [his] penal interest," and as a co-conspirator, he

"had personal knowledge of the facts he shared with law enforcement." <u>Daniels</u> <u>v. City of Hartford</u>, 645 F. Supp. 2d 1036, 1054-55 (M.D. Ala. 2009) (finding co-defendant's statement about defendants' involvement in the murder and assault for hire conspiracy were sufficient to establish probable cause to arrest defendants); <u>see also</u> <u>Damali</u>, 766 F. App'x at 827 (footnote omitted) (finding the identification of defendant by a "known participant in the . . . robbery" was "sufficient to establish probable cause" for defendant's arrest).   Sterling's statements constituted "'reasonably trustworthy information'" that was sufficient to establish probable cause for Davis' arrest.  <u>Craig</u>, 127 F.3d at 1045 (citation omitted) (finding co-defendant's statement "incriminating himself as well as [defendant] ensured that his statements about [defendant] were 'reasonably trustworthy information,' which is all probable cause requires"); <u>see also</u> <u>Ortega</u> <u>v. Christian</u>, 85 F.3d 1521, 1525 (11th Cir. 1996) (citation and internal marks omitted) ("Probable cause does not require overwhelmingly convincing evidence, but only reasonably trustworthy information.").[34]  Accordingly, under the totality

---

[34] Moreover, Inv. Trammel also had surveillance footage showing that Davis was present with co-defendant Butler at the Best Western Hotel, which was located in the vicinity of OB's Barbeque, where the Dodge Charger switch car was found. (Davis Tr. at 32, 40-41).

of the circumstances, the government demonstrated probable cause for Davis'

arrest, and his motion to suppress on this basis is due to be denied.[35]

---

[35] In his post-hearing brief, Davis asserts that "[t]here is nothing in the record to establish that police officers from Griffin, Georgia, had jurisdictional authority to arrest [ him] in Atlanta, Fulton County, Georgia." [Doc. 222 at 9]. However, the record does not reflect that GPD officers arrested Davis in Atlanta. Instead, Inv. Trammel testified that he was not present on the scene when Davis was arrested, and he was informed of the arrest by FBI Agent Floyd. (Davis Tr. at 44). In his motion to suppress, Davis simply asserted that "FBI agents and state law enforcement officers" arrested him at a construction job-site in Atlanta where he was working, [Doc. 91 at 2], but he did not identify any issue about the GPD's jurisdictional authority in his motion, nor did he develop this argument beyond a single sentence assertion in his post-hearing brief, so it does not merit any further discussion, see United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000) (citation omitted) ("A court need not act upon general or conclusory assertions[.]'"); United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985) (citations omitted) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented"); United States v. Carachure-Guzman, CRIMINAL ACTION FILE NO. 1:18-CR-79-SCJ-JKL-1, 2019 WL 4397352, at *10 (N.D. Ga. Apr. 23, 2019), adopted by 2019 WL 3369677, at *3 (N.D. Ga. July 25, 2019) ("Despite filing a motion to suppress, an amended motion, a post-hearing brief, and a reply brief, [d]efendant provides no real argument as to how Carpenter has any effect on the GPS Warrant in this case."). Similarly, in his post-hearing reply, Davis asserts that there is no evidence in the record or before the Court that police had a valid arrest warrant for him. [Doc. 237 at 4]. While Davis noted in his motion to suppress that he was "unsure whether or not officers possessed an arrest warrant for [him]," [Doc. 91 at 4 n.1], he did not advance any argument about the absence of an arrest warrant in his post-hearing brief, see generally [Doc. 222], so he has forfeited this argument since it was raised for the first time in his reply, Noriega, 676 F.3d at 1260. Moreover, even if the argument had been preserved, as with his contention that GPD officers lacked jurisdiction to arrest him in Atlanta, he has not adequately presented this argument for the Court's consideration. Cooper, 203 F.3d at 1284; Carachure-Guzman, 2019 WL 4397352, at

### ii.   Waiver of Miranda Rights

Davis next argues that he did not knowingly and voluntarily waive his Miranda rights because the agents failed to advise him that he had been charged with crimes until 20 minutes after he signed the Miranda waiver form and when Inv. Trammel read him his rights, he employed "'speed-reading' tactics," which "rendered [] Davis' wavier unknowing, involuntary and invalid." [Doc. 222 at 14-16]. The government responds that Davis voluntarily, knowingly, and intelligently waived his Miranda rights as "Inv[. ] Trammel[] thoroughly reviewed the *Miranda* rights with Davis orally and in writing," and Davis acknowledged that he understood each right and then executed the waiver form by initialing each right he waived and signing the waiver form. [Doc. 233 at 8-9 (citations omitted)].

The ruling in Miranda requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation. See Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994).[36] "A

---

*10; United States v. Jones, No. 1:12-cr-380-WSD, 2013 WL 5963125, at *3 (N.D. Ga. Nov. 7, 2013).

[36] The parties do not dispute that Davis was subjected to a custodial interrogation for purposes of Miranda. See [Docs. 222, 233, & 237]; see also United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)) ("A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"); United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (quoting Rhode

defendant may waive these rights, but only if 'the waiver is made voluntarily, knowingly and intelligently,'" and it is the government's burden to prove by a preponderance of the evidence that the defendant validly waived his rights. United States v. Bernal-Benitez, 594 F.3d 1303, 1318 (11th Cir. 2010) (citations omitted); see also Colorado v. Connelly, 479 U.S. 157, 168 (1986) (citations omitted) ("Whenever the [government] bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the [government] need prove waiver only by a preponderance of the evidence."). There is a "two-part inquiry into whether a defendant's waiver of *Miranda* rights was voluntary, knowing, and intelligent," which involves first assessing whether "the relinquishment of the right [was] . . . voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and second, whether the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "'[V]oluntariness' in the context of a *Miranda* wavier means the same thing as 'voluntariness' in the due

---

Island v. Innis, 446 U.S. 291, 301 (1980)) ("Interrogation [] means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'").

73

process context, i.e., freedom from official coercion." <u>Miller v. Dugger</u>, 838 F.2d 1530, 1538 (11th Cir. 1988) (citing <u>Connelly</u>, 479 U.S. at 169).

"Statements made in violation of *Miranda* are not admissible at trial." <u>United States v. Barry</u>, 479 F. App'x 297, 299 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted).  However, if "the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension, a court may properly conclude that the *Miranda* rights have been waived." <u>United States v. Rush</u>, 144 F. App'x 13, 15 (11th Cir. 2005) (per curiam) (unpublished) (alterations, footnote, citation, and internal marks omitted); <u>see also</u> <u>Moran</u>, 475 U.S. at 421.  "[A]n express oral or written waiver of *Miranda* is strong proof of the validity of the waiver." <u>United States v. Graham</u>, Criminal Action File No. 3:13–cr–11–TCB, 2014 WL 2922388, at *14 (N.D. Ga. June 27, 2014) (citation omitted).

Considering the totality of the circumstances, the Court concludes that Davis voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights.  After he was arrested on September 12, 2019, Davis was transported to the APD headquarters where he was interviewed by Inv. Trammel, Inv. Jackson, and Agent Floyd.  (Davis Tr. at 12, 28, 31, 44).  At the outset of the interview, Inv. Trammel informed him that they wanted to ask him about an incident that occurred in Griffin, and he explained that he was going to read Davis each of his rights and

ask whether he understood them, and he then read each right from the <u>Miranda</u>

Waiver Certificate and asked if Davis understood each one, and Davis nodded his

head in the affirmative that he understood each time.  (Davis Tr. at 12, 47-48; Davis

Gov't Ex. 1 at 1:20:58-1:22:08).[37]   Davis then initialed next to each right on the

Waiver Certificate and signed at the bottom, which Inv. Trammel stated would

indicate that he understood what was read to him.  (Davis Gov't Ex. 1 at 1:22:09-

1:23:00; Davis Gov't Ex. 2).[38]   Inv. Trammel did not write that the subject of the

---

[37] The Waiver Certificate provided, in pertinent part:

> [Inv. Trammel] told me that:
>
> 1.   I have the right to remain silent.
>
> 2.   Anything I say can be used against me in a court of law.
>
> 3.   I have the right to talk to a lawyer and have him present with me while I am being questioned.
>
> 4.   If I cannot afford to hire a lawyer, one will be appointed to represent me before any questioning, if I wish.
>
> 5.   I can decide at any time to exercise these rights and not answer any questions or make any statements.

(Davis Gov't Ex. 2 (all caps omitted)).

[38] The government points out that "Davis can read, write and speak English, and has a 12th grade education."  [Doc. 233 at 9 (citations omitted)]; <u>see also</u> (Davis Gov't Ex. 2).

interview was a "Robbery" until after Davis signed the form, (Davis Tr. at 45; Davis Gov't Ex. 2), and he did not explain what charges had been brought against Davis until later in the interview, see (Davis Gov't Ex. 1 at 1:29:40-1:29:55, 1:44:33-1:45:04).  The tone of the interview was conversational and non-threatening, and the investigators even permitted Davis to take a cigarette break at one point.  See (Davis Gov't Ex. 1).

Davis "cites no authority, and [the Court] is aware of none, holding that a defendant must know of the charges against him to validate a *Miranda* waiver." United States v. Whiteford, 676 F.3d 348, 362 (3d Cir. 2012).[39]  A "suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Colorado v. Spring, 479 U.S. 564, 577 (1987).  Indeed, the Supreme Court has rejected the notion that "mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights[.]" Id. at 564 (footnote omitted).  "Here, although not advised of the charges or the [specific]

---

[39] "[E]ven if such information were relevant, . . . it would be just one factor in the totality of the circumstances." United States v. Orr, Case No. 3:15-cr-67-J-39JRK, 2015 WL 13871043, at *14 (M.D. Fla. Dec. 8, 2015), adopted by 2016 WL 11690648, at *6 (M.D. Fla. Apr. 27, 2016), aff'd, 819 F. App'x 756 (11th Cir. 2020) (per curiam) (unpublished).

subject matter of the investigation [until after he signed the <u>Miranda</u> waiver form],

[Davis] was given a clear recitation of his <u>Miranda</u> rights, including the clear

warning, without any qualification, that anything [he] said could be used against

him in court." <u>Orr</u>, 2015 WL 13871043, at *14 (emphasis and citations omitted).

Accordingly, despite Davis' contention that the investigators obtained his waiver

through deception and deliberate omissions, [Doc. 222 at 15], the mere fact that

Davis was not informed of the specific charges brought against him before he

signed the Waiver Certificate or freely spoke with the investigators is insufficient

to support a finding that his waiver was not knowing, voluntary, and intelligent,

<u>see</u> <u>United States v. Davis</u>, 796 F. App'x 274, 276 (6th Cir. 2019) (per curiam)

(unpublished) (rejecting defendant's argument that "by failing to inform him of

the charges under investigation, law enforcement used 'trickery or deception' to

persuade him to waive his privilege under the Fifth Amendment," as the "record

[did] not reflect that [he] was misled about the investigation or that his waiver of

*Miranda* rights was otherwise invalid" and concluding that "the district court

properly denied [his] motion to suppress his statements to law enforcement").[40]

---

[40] Davis argues that Inv. Trammel confusingly gave Davis different messages
regarding whether he had been charged at various points in the interview, stating
at one time that he had been charged, and at another time that he was going to be
charged. [Doc. 222 at 14; Doc. 237 at 9]. However, the video recording clearly
shows that Inv. Trammel specifically informed Davis that he had been charged
with armed robbery, aggravated assault, possession of a firearm by a convicted
felon, and possession of a firearm during the commission of a crime, <u>see</u> (Davis

Additionally, despite Davis' contention that Inv. Trammel employed speed-reading tactics that rendered his waiver unknowing, involuntary, and invalid, [Doc. 222 at 15], Davis "has not convinced the Court that the manner in which [Inv. Trammel] read the *Miranda* [Waiver Certificate] was not understandable or not clear," United States v. Busch, Cr. No. 20-1486 KG, 2021 WL 3115837, at *2 (D.N.M. July 22, 2021).  The video recording of Davis' September 12, 2019, interview depicts that Inv. Trammel read Davis his Miranda rights at a reasonable speed that adequately enabled Davis to understand his rights, especially considering that Inv. Trammel paused after reading each right and explicitly asked Davis whether he understood the right that was just read to him, and Davis indicated that he understood each time and voluntarily signed the Waiver Certificate and initialed next to each right.  See (Davis Gov't Ex. 1 at 1:21:46-1:23:00; Davis Gov't Ex. 2). Moreover, it is clear that Davis understood his rights as he later exercised his right not to answer certain questions when the topic of other robberies was raised, indicating that he preferred only to discuss that subject with a lawyer present.  See (Davis Tr. at 25-26; Davis Gov't Ex. 1 at 1:49:22-1:50:25).  Based on the totality of the circumstances, the Court finds Davis' Miranda waiver was made voluntarily,

---

Gov't Ex. 1 at 1:29:40-1:29:55, 1:44:33-1:45:04), and Davis has not provided a citation to the video recording identifying any point at which Inv. Trammel allegedly gave conflicting information.  In any event, as discussed, it was not necessary that Davis be informed about the charges against him to validly waive his Miranda rights.

knowingly, and intelligently.  See United States v. James, 18-CR-3494 JB-LF-1, 2019 WL 2121363, at *7 (D.N.M. May 15, 2019), adopted by 406 F. Supp. 3d 1025 (D.N.M. 2019) (citation omitted) (finding, "based on the totality of the circumstances," that the officer's "recitation of the *Miranda* warnings was adequate, and that [defendant's ] waiver of his rights was voluntary, knowing and intelligent," where, although the officer "read [defendant ] his rights very quickly, it was not so fast that they were incomprehensible, nor would [defendant ] necessarily have felt coerced into answering," and "[t]hroughout the encounter . . . , [the officer] sometimes spoke very quickly," but he "never raised his voice, nor did he ever threaten [defendant ]" and he "was polite and conversational throughout the encounter," and defendant "demonstrated that he understood that he had rights and did not need to acquiesce to all of [the officer's] requests," as he declined the officer's request to let him search his vehicle); United States v. Welton, Case No. CR 09-00153 MMM, 2009 WL 10680851, at *6 (C.D. Cal. July 20, 2009) (first alteration in original) (footnote, citation, internal marks omitted) (concluding that defendant "voluntarily, knowingly, and intelligently waived his *Miranda* rights," despite his contention that the agent "read the rights so quickly and ran the words together that [he] did not understand what she said," because the court had "carefully reviewed . . . the digital recording of the entire conversation" and although her "cadence quickened slightly" as she read the oral warnings from a

script, "the entire warning was clear and comprehensible," which conclusion was "bolstered by the fact that [defendant] expressed no confusion after [the agent] completed the oral warnings," and defendant "was then given a written *Miranda* waiver form (which reproduced the entire warming), which he voluntarily signed").  Thus, Davis' motion is due to be denied on this basis.

### iii.    <u>Invoking the Right to Counsel</u>

Davis argues that he invoked his right to counsel by stating, "'I'm gonna need a lawyer, [ain't] I?'" and that all questioning of him should therefore have immediately ceased, but instead, he "was badgered and manipulated into waiving his previously asserted *Miranda* rights."  [Doc. 222 at 16-19 (emphasis and citation omitted)].  The government acknowledges that a clear invocation of the right to counsel does require the police to stop questioning, but that an ambiguous mention of an attorney does not, and in this case, the investigators stopped questioning Davis upon his mention of counsel, but Davis then changed his mind, re-initiated the interview, and waived his right to counsel, and thus, questioning permissibly continued.   [Doc. 233 at 10-16].   Accordingly, the government contends that "the police scrupulously honored Davis' Fifth and Sixth Amendment rights."  [<u>Id.</u> at 6].

An accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until

counsel has been made available[ ]to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 474-85 (1981); see also Berghuis v. Thompkins, 560 U.S. 370, 381 (2010) (citation and internal marks omitted) (explaining that a suspect has the "right to cut off questioning" when he unambiguously invokes his right to remain silent). "*Edwards* set forth a 'bright-line' rule that *all* questioning must cease after an accused requests counsel." Smith v. Illinois, 469 U.S. 91, 98 (1984) (citation omitted); see also Davis v. United States, 512 U.S. 452, 458 (1994) (citation omitted) ("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."); Miller, 838 F.2d at 1537 (citation omitted) (explaining that police must cease all questioning once the suspect invokes the right to an attorney). However, it is "well settled that law enforcement officers have no duty to stop an interrogation where the suspect's invocation of [his right to counsel ] is equivocal." United States v. Acosta, 363 F.3d 1141, 1152 (11th Cir. 2004); see also Davis, 512 U.S. at 459 (citation omitted) ("[T]he suspect must unambiguously request counsel. . . . If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect."); United States v. Dowd, 451 F.3d 1244, 1250 (11th Cir. 2006) (alteration in original) (citations and internal marks omitted) ("The government has no duty to cease

questioning a suspect where the suspect's invocation of [his *Miranda* rights] is equivocal.").

Moreover, an accused who invokes the right to counsel may waive that right by later initiating communication with law enforcement. See Hill v. Crosby, No. 804CV1666T24TGW, 2005 WL 3372888, at *7 (M.D. Fla. Dec. 12, 2005) (citations omitted) ("Interrogation of a suspect is permissible after the suspect has invoked his right to counsel when the suspect initiates contact with investigating officers and knowingly, voluntarily, and intelligently waives his constitutional rights."). The waiver must be voluntary, knowing, and intelligent, which requires that (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Everett v. Sec'y, Fla. Dep't of Corrs., 779 F.3d 1212, 1241 (11th Cir. 2015) (citation and internal marks omitted). "Where a defendant initiated further conversation with the police, '[c]ourts must . . . satisfy themselves that the defendant-initiated confession was not the product of improper police questioning or pressure.'" Id. (alterations in original) (quoting Henderson v. Singletary, 968 F.2d 1070, 1074 (11th Cir. 1992)).

After Davis executed the <u>Miranda</u> Waiver Certificate, he spoke freely to the investigators and answered their questions about the attempted robbery, and approximately ten minutes later, Davis paused in response to a question and asked whether he was going to need a lawyer, to which Inv. Trammel responded, "That's up to you," and explained that it was his right to have a lawyer present if that was what he wanted.  (Davis Tr. at 13; Davis Gov't Ex. 1 at 1:23:00-1:34:30).  Davis requested a cigarette break, which the investigators provided to him, and when they returned to the interrogation room, Davis was the first to speak, stating that he would tell the investigators what he knew, but that he thought he would prefer to have a lawyer present, and he asked the investigators how long it would take to get a lawyer, explaining that he did not want to be there all day.  (Davis Gov't Ex. 1 at 1:34:31-1:43:47).  Inv. Trammel explained that he could not get him a lawyer that day if he needed appointed counsel.  (Davis Gov't Ex. 1 at 1:43:50-1:44:05).  Davis then stated that if he was going to be incriminating himself, he would rather have a lawyer present, and Inv. Trammel reiterated that it was his right to have counsel present and that if he was asking for a lawyer, the investigators would need to leave and stop asking him questions, adding that he was not sure when there would be another opportunity to speak with them.  (Davis Gov't Ex. 1 at 1:44:07-1:44:32).  Davis asked whether the investigators wanted to ask him questions to see what charges they could bring against him, and Inv. Trammel

clarified that Davis had already been charged with armed robbery, aggravated assault, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a crime. (Davis Gov't Ex. 1 at 1:44:33-1:45:04).

Inv. Trammel then asked Davis whether he wished to have a lawyer present before he continued talking or if he wished to answer questions without a lawyer, and Davis responded that there were certain questions for which he would prefer to have a lawyer present. (Davis Gov't Ex. 1 at 1:45:04-1:45:22). Inv. Trammel began to conclude the interview, stating that he could not continue to talk to Davis at that time, and he told Davis to speak with his lawyer if he wanted to continue the interview at another time. (Davis Tr. at 24; Davis Gov't Ex. 1 at 1:45:23-1:45:44). However, Davis then clarified that the investigators could continue to ask him questions about certain topics, but that he would refuse to answer some questions without a lawyer present and leave this up to his own judgment. (Davis Gov't Ex. 1 at 1:45:45-1:45:57). Inv. Trammel then asked, "So, you're willing to talk to us without a lawyer present?" and Davis responded by nodding his head and saying, "Yeah," and Inv. Trammel asked whether Davis understood that it was his right to have a lawyer and whether he was willing to answer some questions without a lawyer present, and Davis answered affirmatively. (Davis Gov't Ex. 1 at 1:46:00-1:46:13). The interview then proceeded with the investigators asking questions about the robbery, and when Inv. Trammel began asking questions about another

robbery that had taken place, Davis declined to answer the question and indicated that this was a topic for which he wanted to have a lawyer present to discuss, and Inv. Trammel re-directed the conversation to the topics Davis was willing to discuss at that time.  (Davis Tr. at 25-26; Davis Gov't Ex. 1 at 1:49:22-1:50:25).

The government asserts that "the police simply tried to clarify that Davis wanted a lawyer, [and] advised him that it was his right and that they could not talk to him if he wanted a lawyer." [Doc. 233 at 13 (footnote and citation omitted)]. The government adds that Davis' initial question regarding whether he was going to need a lawyer was not an unequivocal request for a lawyer, and once he appeared to state that he wanted to have a lawyer present for questioning, the investigators immediately stopped the interview.  [Id. at 12 (citations omitted)]. Indeed, when Davis initially asked whether he needed a lawyer, he did not unequivocally state that he was unwilling to continue the interview without counsel.  See (Davis Gov't Ex. 1 at 1:33:55-1:34:12).  Officer Trammel continued to converse with Davis after he asked whether he needed a lawyer, and "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney."  Davis, 512 U.S. at 461.  "Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-

guessing as to the meaning of the suspect's statement regarding counsel." Id.
"That was the procedure followed by the [investigators] in this case." Id.

When Inv. Trammel asked clarifying questions to determine whether Davis was invoking his right to counsel, Davis made a statement that he would prefer to have a lawyer present to answer certain questions, and Inv. Trammel began to conclude the interview. See (Davis Gov't Ex. 1 at 1:44:14-1:45:44). However, Davis then clarified that the investigators could ask him some questions, but that there would be certain questions he would refuse to answer without a lawyer present, and Inv. Trammel confirmed that Davis was willing to speak with them without a lawyer by re-iterating that it was his right to have counsel and asking whether he was willing to answer some questions without a lawyer before continuing the interview. (Davis Gov't Ex. 1 at 1:45:45-1:46:30). Accordingly, the record reflects that the investigators ceased questioning Davis once he asked whether he needed counsel and sought to clarify whether he was actually invoking his right to counsel and continued the interview only after Davis clearly stated that he would answer some questions without a lawyer present. "[W]here the accused initiates a conversation after a request for counsel, an officer's explanation of the investigation and the possibility of cooperation [does] not violate Edwards." Gomez, 927 F.2d at 1537 (citing United States v. Valdez, 880 F.2d 1230, 1233-34 (11th Cir. 1989). The fact that Davis declined to answer certain questions without

a lawyer present reflects that he understood his rights. See James, 2019 WL 2121363, at *7 ("[Defendant] demonstrated that he understood that he had rights and did not need to acquiesce to all of [the officer's] requests").

Moreover, while Davis complains that Inv. Trammel told him there would be a delay in securing appointed counsel for him, "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." Duckworth v. Eagan, 492 U.S. 195, 204 (1989) (footnote omitted). "If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel." Id. (citation omitted). Although Inv. Trammel informed Davis that he could not provide him a lawyer that day, he reiterated Davis' right to have counsel several times and attempted to determine whether Davis wanted to invoke his right to counsel, maintaining a calm and conversational tone throughout their conversation and allowing Davis to take a cigarette break as he considered his decision, and based on the totality of these circumstances, the Court finds that Davis voluntarily waived his right to counsel. See United States v. Eubank, No. CR414-005, 2015 WL 545748, at *2 (S.D. Ga. Feb. 10, 2015), adopted by 2015 WL 1259276, at *1 (S.D. Ga. Mar. 8, 2015) (alteration and citation omitted) (finding the defendant's Miranda waiver was not invalidated

where the agent "truthfully and accurately answered" defendant's question about obtaining a lawyer by "explaining that any request for appointed counsel would be addressed by the court, a process that would entail some delay and, hence, necessarily preclude an interview at that time," and "[a]fter this explanation, [] even took pains to 'clarify' whether [defendant] wanted to 'waive his rights and talk to [the investigators] at th[at] time'").  Accordingly, the record reflects that the investigators did not violate Davis' right to counsel by continuing the interview, and because Davis has not identified any legitimate basis for suppression,[41] it is **RECOMMENDED** that his motion to suppress statements, [Doc. 91], be **DENIED**.

_____

[41] Davis also argues that because he said "'you can ask me whatever you want, but without using it,'" and Inv. Trammel "acquiesced to this request and said, 'That's why we are here,'" this "agreement not to use [] Davis' statements against him should be honored and enforced."  [Doc. 222 at 16 (emphasis omitted) (citing (Davis Gov't Ex. 1 at 1:33:44, 1:33:53))].  However, to the extent Davis contends that his statements should be suppressed on the grounds that he was granted some form of informal immunity based on this brief exchange, his argument fails because "[p]romises of immunity from prosecution require an analysis of contract principles," United States v. Sutton, Criminal Action No. 5:08-CR-40(HL), 2009 WL 383385, at *3 (M.D. Ga. Feb. 11, 2009) (citation omitted), and "[i]t is a fundamental principle of contract law that the existence of a valid contract requires mutual assent by all parties to all terms," id. (citations omitted), but the video recording of Davis' interview does not support finding that there was a meeting of the minds between Davis and Inv. Trammel on this point, see (Davis Gov't Ex. 1 at 1:33:44-1:33:55).  Instead, as already discussed, there was an extended conversation beyond this brief exchange early in the interview about whether Davis would speak with the investigators without an attorney, and when he agreed to do so, the only caveat was that he would decline to answer certain questions without an attorney present, and there was no agreement or even any further mention that what he said would not be used against him.  Thus, the Court rejects Davis'

### 2.     Daniel's Motion to Suppress Statements, [Doc. 95]

Daniel moves to suppress any and all statements he made after his arrest on August 16, 2019.  [Doc. 95].  He argues that his statements should be suppressed because he did not knowingly, voluntarily, and intelligently waive his <u>Miranda</u> rights during any of his three interrogations.  [Doc. 225 at 4-6].  The government responds that each of Daniel's statements were taken in compliance with <u>Miranda</u> and should not be suppressed.  <u>See</u> [Doc. 236].  The Court will address each of Daniel's interrogations and determine whether he validly waived his <u>Miranda</u> rights in turn.[42]

#### a.     *Statement of Facts*

Following the attempted armed robbery of the Brink's armored car at the Regions Bank in Griffin, Georgia, on August 16, 2019, Daniel was arrested after being located in the vicinity of where the Dodge Charger switch car was found in McDonough, Georgia.  (Daniel Tr. at 6, 15, 37, 51-52).  After his arrest, Daniel was interviewed by GPD Sergeant Joe Hudson ("Sgt. Hudson") while he sat in the back of a patrol car.  (Daniel Tr. at 6-8, 45, 48).  Daniel was handcuffed at the time of this

---

argument that Inv. Trammel agreed not to use any of his statements against him, as this contention is not supported by the evidence.

[42] As an initial matter, the Court notes that the parties do not dispute that Daniel was subjected to a custodial interrogation during each of the interviews in question and that <u>Miranda</u> therefore applies.  <u>See</u> [Docs. 95, 225, & 236].

interview.  (Daniel Tr. at 24, 53-54).  At the outset of the interview, Sgt. Hudson

introduced himself to Daniel and read him his <u>Miranda</u> rights from a card.  (Daniel

Tr. at 7; Daniel Gov't Ex. 1 at 16:27:13-16:27:54).  After being advised of his <u>Miranda</u>

rights, Sgt. Hudson asked Daniel whether he understood his rights and was

willing to talk with him and Daniel responded, "Uhh," which Sgt. Hudson

understood as an acknowledgement that he understood his rights, and Sgt.

Hudson began asking Daniel questions, each of which Daniel answered.  (Daniel

Tr. at 48-49; Daniel Gov't Ex. 1 at 16:27:13-16:33:43).  At no time did Daniel refuse

to talk to Sgt. Hudson.  (Daniel Tr. at 7).  During this interview, Daniel did not

make any admissions regarding being involved in the robbery.  (Daniel Tr. at 50).

Later that day, Daniel was interviewed by Sgt. Hudson and Inv. Trammel

at the at the GPD.  (Daniel Tr. at 6, 9-10, 12).  At the outset of the interview, Inv.

Trammel began filling out a <u>Miranda</u> Waiver Certificate and asked Daniel for his

name, age, and current address.  (Daniel Gov't Ex. 2 at 1:16:25-1:18:17); <u>see also</u>

(Daniel Gov't Ex. 3).  Inv. Trammel next read Daniel his <u>Miranda</u> rights and asked

whether he understood each one, and Daniel responded affirmatively each time,

and then Inv. Trammel asked Daniel to initial the Waiver Certificate next to each

right; print his name, date of birth, and phone number; and then sign at the bottom

of the form.  (Daniel Gov't Ex. 2 at 1:18:18-1:19:58).  After reviewing Daniel's

<u>Miranda</u> rights, Inv. Trammel explained that they were there to talk about an

incident that occurred in Griffin and began asking Daniel questions.  (Daniel Gov't Ex. 2 at 1:19:59-1:20:20).  After the interview was concluded, Daniel was taken to the Spalding County Jail.  (Daniel Tr. at 32).

On August 20, 2019, Inv. Trammel and Sgt. Hudson interviewed Daniel again after requesting that he return for more questioning.  (Daniel Tr. at 15, 18, 34).  Sgt. Hudson advised Daniel of his <u>Miranda</u> rights once again.  (Daniel Tr. at 16-17; Daniel Gov't Ex. 4 at 9:37-10:45).  After reading each right from the <u>Miranda</u> Waiver Certificate, Sgt. Hudson asked that Daniel initial next to each one if he understood his rights, and Daniel did so.  (Daniel Gov't Ex. 4 at 10:46-11:06); <u>see also</u> (Daniel Gov't Ex. 5).  Sgt. Hudson stated that they were there to discuss an armed robbery and added this to the form, and then he asked Daniel to print and sign his name at the bottom of the form.  (Daniel Gov't Ex. 4 at 11:07-11:30).  Before signing the Waiver Certificate, Daniel began denying his involvement in the robbery and asking the investigators questions about the charges against him, and Sgt. Hudson explained that they could not discuss anything with him until he signed the form.  (Daniel Gov't Ex. 4 at 11:34-12:35).  Daniel continued to try to initiate conversation with the investigators, and Sgt. Hudson reiterated that he needed to first sign the form showing that he understood his rights, and explained that by signing the form, he was not admitting to anything and he could stop talking to them at any time, and Daniel then signed the form.  (Daniel Gov't Ex. 4

at 12:37-13:50); see also (Daniel Tr. at 20-21).  After signing the form, Daniel asked a question about the charges against him, which Sgt. Hudson answered, and then the investigators proceeded to question him about the armed robbery.  See (Daniel Gov't Ex. 4 at 14:08-16:30).  Daniel now moves to suppress the statements he made during all three interviews, [Doc. 95], and the government opposes his motion, [Doc. 236].

      **b.**   *Analysis*

          **i.**    <u>**The August 16, 2019, Patrol Car Statements**</u>

Daniel argues that during the August 16, 2019, patrol car questioning, he never gave an affirmative response when Sgt. Hudson read him the <u>Miranda</u> warnings and asked whether he was willing to speak with him, and instead simply said, "Uhh," before Sgt. Hudson began questioning him, which was ambiguous and insufficient for Sgt. Hudson to reasonably conclude that he knowingly and voluntarily waived his rights.  [Doc. 225 at 5 (internal marks omitted)].  The government responds that an express waiver was not required as the totality of the circumstances reflects that Daniel indicated he understood his rights and voluntarily waived them when he spoke to the police without incriminating himself.  [Doc. 236 at 9-12].  The Court agrees.

"It is well-established that, in order to safeguard the privilege against self-incrimination under the Fifth Amendment, law enforcement officials must give

certain warnings to defendants before they are subjected to a custodial interrogation." United States v. Cepeda-Chico, Case No. 6:19-cr-217-Orl-31LRH, 2020 WL 6949002, at *2 (M.D. Fla. June 29, 2020) (footnote and citation omitted) (citing Miranda, 384 U.S. at 444).   As previously discussed, "it is the [g]overnment's 'heavy burden' to demonstrate that the [d]efendant knowingly, voluntarily and intelligently waived his *Miranda* rights." United States v. Spinks, CRIMINAL CASE NO.: 1:16-cr-00015-14-AT-JSA, 2016 WL 7383341, at *4 (N.D. Ga. Sept. 28, 2016), adopted by 2016 WL 7385716, at *1 (N.D. Ga. Dec. 19, 2016) (citation omitted).  "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." Moran, 475 U.S. at 421 (citations and internal marks omitted).  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, or the use of any promises or inducements by police." United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *7 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted).

However, the government need not "show that a waiver of *Miranda* rights was express, and an implicit waiver of the *Miranda* rights is sufficient." Hall v. Thomas, 611 F.3d 1259, 1285 (11th Cir. 2010) (citations and internal marks omitted); see also Orr, 2015 WL 13871043, at *11 (citation omitted) ("A waiver of one's

Miranda rights need not be express to be valid."). "Where the [government] shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Thompkins, 560 U.S. at 384; see also United States v. Grant, Criminal Action No. 1:09-CR-482-TWT-LTW, 2011 WL 2580867, at *8 (N.D. Ga. May 4, 2011), adopted by 2011 WL 2580779 (N.D. Ga. June 29, 2011), aff'd, 521 F. App'x 841 (11th Cir. 2013) (unpublished) (citation omitted).

Daniel, who was 49 years old at the time of the interview and had an 11th grade education, was arrested on August 16, 2019, and while he was handcuffed and seated in the back of a parked patrol car with the door open, Sgt. Hudson approached, introduced himself, and read Daniel his Miranda rights from a card. (Daniel Tr. at 6-8, 24, 53-54; Daniel Gov't Ex. 1 at 16:27:13-16:27:54; Daniel Gov't Exs. 2 & 5). After reading Daniel his rights, Sgt. Hudson asked Daniel whether he understood his rights and was willing to talk with him and Daniel responded, "Uhh," and then Sgt. Hudson proceeded to ask Daniel questions, which Daniel readily answered. See (Daniel Gov't Ex. 1 at 16:27:50-16:33:43). Sgt. Hudson testified at the evidentiary hearing that he understood Daniel's response as an acknowledgement that he understood his rights and that since Daniel "never said no or elaborated beyond that, [ he] just started asking questions." (Daniel Tr. at

48-49, 51).   At no point during this brief interview,[43] did Daniel ever refuse to answer any of Sgt. Hudson's questions, nor did he make any admissions regarding his involvement in the robbery at that time.  (Daniel Tr. at 7, 50).  The video footage of the patrol car interview shows that Sgt. Hudson maintained a conversational tone during his interaction with Daniel and never raised his voice, brandished his weapon, or used any force to coerce Daniel to respond to questioning.  See (Daniel Gov't Ex. 1 at 16:27:13-16:33:43).

While Daniel may not have explicitly waived his Miranda rights by responding, "Uhh," after Sgt. Hudson read him his rights, the government argues that Daniel impliedly waived them by voluntarily making statements in response to police questioning.  [Doc. 236 at 10].  The Court agrees.  "A waiver can be implied when, as here, the suspect is advised of his rights and acts in a manner inconsistent with the exercising of those rights."  United States v. Richardson, 732 F. App'x 822, 826 (11th Cir. 2018) (per curiam) (unpublished) (citation omitted).  Daniel "made the statements at issue only after [Sgt. Hudson] advised him of his Miranda rights," and there is nothing in the record to suggest that Sgt. Hudson "employed coercion, threats, or violence in obtaining [Daniel's] statements."  United States v. Toyer, 274 F. App'x 844, 846 (11th Cir. 2008) (per curiam)

---

[43] The entire patrol car interview lasted less than ten minutes.  See (Daniel Gov't Ex. 1 at 16:27:13-16:33:43).

(unpublished).  Daniel "points to no evidence of threat or coercion leading to his statement[s], and the evidence indicates that [he] understood both his right to remain silent and the consequences of waiving that right."  <u>United States v. Robinson</u>, Criminal Action No. 1:07–CR–0138–BBM–CCH, 2007 WL 9676863, at *5 (N.D. Ga. Nov. 19, 2007), adopted by 2008 WL 11383732, at *4 (N.D. Ga. Feb. 22, 2008) (citation omitted).  Accordingly, the Court concludes that Daniel knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights during the patrol car interview and that his motion to suppress the statements made during that interview is due to be denied.

### ii.   The August 16 and 20, 2019, Police Station Statements

Daniel argues that his <u>Miranda</u> waiver on August 16, 2019, was problematic because he "was informed of his rights, but not that he was waiving them, when he signed the form," as Inv. Trammel "only asked [ him] to sign stating that he understood his rights," and Inv. Trammel also "did not tell [] Daniel what he wanted to speak with him about before [] Daniel signed the form."  [Doc. 225 at 5-6 (citations omitted)].  Daniel also argues that his <u>Miranda</u> waiver on August 20, 2019, was invalid as he "initialed indicating that he understood his rights" but "when [Sgt.] Hudson informed [] Daniel that they would be discussing an armed robbery, [] Daniel hesitated to sign and denied any involvement in the armed robbery" and "said that he wanted to find out about the charges that were on him,"

but Sgt. Hudson and Inv. Trammel "refused to answer any of [ his] questions until he signed the waiver form," and thus, his waiver was not "a free and deliberate choice" but instead was "the product of [Sgt.] Hudson and [Inv.] Trammel compelling him to waive in order to obtain more information about the charges he faced." [Id. at 6]. The government responds that Daniel's execution of the Miranda waiver form on both occasions is strong evidence that he knowingly and voluntarily waived his rights, and that whether the waiver was knowingly and intelligently made does not hinge on whether he knew of the charges the police wanted to question him about. [Doc. 236 at 12-14]. Additionally, the government asserts that "Daniel's argument that he was informed of his rights, but not that he was waiving them when he signed the *Miranda* waiver form is rebutted by the record," as the forms he executed on both August 16 and August 20, 2019, contradict his contention. [Id. at 12 (citations omitted)].

On August 16, 2019, Daniel was interviewed by Sgt. Hudson and Inv. Trammel at the GPD and at the outset of the interview, Inv. Trammel reviewed the Miranda Waiver Certificate with him, including by asking Daniel for his name, age, and current address; reading Daniel each of his rights and asking whether he understood them, which Daniel confirmed after each right; and then asking Daniel to initial next to each right, print his name and identifying information, and sign at the bottom of the form to indicate that he had not been threatened or promised

anything in exchange for his statements. (Daniel Gov't Ex. 2 at 1:18:10-1:19:58; Daniel Gov't Ex. 3). Similarly, on August 20, 2019, when Daniel was interviewed for a second time at the GPD by Inv. Trammel and Sgt. Hudson, Sgt. Hudson began the interview by advising Daniel of his <u>Miranda</u> rights using the Waiver Certificate; asking Daniel to initial next to each right if he understood them, which Daniel did; adding to the form and stating to Daniel that they were planning to interview him regarding an armed robbery; and asking Daniel to sign at the bottom of the form to indicate that he had not been threatened to respond to questioning. (Daniel Gov't Ex. 4 at 9:37-11:30; Daniel Gov't Ex. 5). After initialing next to each right, but before signing at the bottom of the form to show that he had "not been threatened," had "not been promised anything," and had "not been forced in any way to answer questions or make any statements," (Daniel Gov't Ex. 5 (all caps omitted)), Daniel began asking the investigators questions about the charges against him, (Daniel Gov't Ex. 4 at 11:34-12:35). Sgt. Hudson explained that they could not begin speaking with him until he signed the form, and after some back and forth on this point, Sgt. Hudson clarified that signing the form would not constitute an admission and that he could stop talking to them at any time, and Daniel then signed the form, (Daniel Gov't Ex. 4 at 11:45-13:27), and before beginning the interview, Sgt. Hudson answered Daniel's question about the charges, (Daniel Gov't Ex. 4 at 14:10-14:45). Each of the Waiver Certificates Daniel

executed were titled, in all caps, "WAIVER CERTIFICATE"; provided that the officer told him that he had "the right to remain silent," that "anything [he said could] be used against [him] in a court of law," that he had "the right to talk to a lawyer and have [one] present with [him] while [he was] being questioned," that a lawyer would "be appointed to represent [him] before any questioning" if he could not afford a lawyer and wished to have one present, and that he could "decide at any time to exercise these rights and not answer any questions or make any statements"; and stated, "I UNDERSTAND MY RIGHTS."  (Daniel Gov't Exs. 3 & 5 (all caps omitted)).

Beginning with Daniel's argument that on August 16, 2019, he did not understand that he was waiving the rights because he "was informed of his rights, but not that he was waiving them, when he signed the form," [Doc. 225 at 5], the Court finds under the totality of the circumstances that Daniel knowingly and voluntarily waived his rights by signing the form and then proceeding to answer the questions posed by the investigators.  Daniel was verbally informed of his rights, and he also had the opportunity to view the form for himself before signing it.  While a "signed *Miranda* waiver is usually strong evidence that the defendant waived his rights," Bernal-Benitez, 594 F.3d at 1319 (citation omitted); see also United States v. Harrison, CR No. 2:12CR193-MEF, 2013 WL 1918862, at *4 (M.D. Ala. Apr. 5, 2013), adopted by 2013 WL 1917814, at *1 (M.D. Ala. May 8, 2013)

(citation omitted), and the form Daniel signed was entitled in all caps, "WAIVER CERTIFICATE," (Daniel Gov't Ex. 3), the form did not include any statement other than the title to indicate that by signing the form, Daniel was waiving the rights listed on the form.  Rather, above Daniel's signature, the form simply stated, "I UNDERSTAND MY RIGHTS."  (Daniel Gov't Exs. 3).  So, the form and Daniel's signature thereon establish, at a minimum, that he understood his rights, and there is no evidence that Inv. Trammel coerced Daniel into signing the form as he clearly explained each right that was listed and after reading each one, paused and asked Daniel whether he understood, which Daniel confirmed each time, and he asked Daniel to sign the form at the bottom to show that he was not threatened.  (Daniel Gov't Ex. 2 at 1:18:18-1:19:58).  With full understanding of his rights, Daniel waived his rights by proceeding to answer the questions posed by Inv. Trammel, Richardson, 732 F. App'x at 826, and the fact that Inv. Trammel did not explicitly state that Daniel was waiving his rights did not render his waiver invalid, see United States v. Martinez, CASE NO. 4:17-CR-00153-BSM, 2021 WL 2905458, at *1 (E.D. Ark. July 9, 2021) (concluding that under the totality of the circumstances, defendant "waived his rights knowingly, voluntarily, and intelligently" even though the interrogating officer "told him the waiver form meant he understood, not that he was waiving his rights," where the officer "read each line of the waiver

form, asked if [he] understood, and then asked him to initial indicating that he understood").

Next, Daniel argues that his August 16, 2019, waiver was invalid because Inv. Trammel did not tell him what he wanted to speak with him about before Daniel signed the form, and that his August 20, 2019, wavier was invalid because he hesitated before signing the form, wanting to ask questions about his charges, but Sgt. Hudson refused to answer his questions until he signed the form and thereby compelled him to waive his rights to obtain more information about his charges. [Doc. 225 at 6]. However, as previously discussed with respect to Davis' motion to suppress statements, a "suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Spring, 479 U.S. at 577. "The [Waiver Certificates] . . ., which [Daniel] both [had the opportunity to] read for himself and had read out loud to him before he initialed and signed [them], conveyed in clear language each of the warnings required by *Miranda*," and while a better understanding of the specific charges against him or the specific subject matter of the forthcoming interrogation "would no doubt have been useful, possibly even decisive, to [Daniel] in calculating the wisdom of answering [the investigators'] questions," their failure to clearly inform him about this prior to his waiver "was not 'constitutionally significant[]' because

the lack of that information did not prevent [Daniel] from understanding the nature of his rights and the legal consequences of waiving them." United States v. Farley, 607 F.3d 1294, 1328 (11th Cir. 2010) (citations omitted).

Although Daniel hesitated before signing the August 20, 2019, Waiver Certificate, this does not render his ultimate waiver involuntary. The government correctly points out that by the time Daniel hesitated, he had already initialed next to each right indicating that he understood them, and he signed the form once the investigators made clear that signing it did not constitute an admission that he committed any crimes. [Doc. 236 at 15 (citation omitted)]. Additionally, this was Daniel's third time receiving the Miranda warnings in this case alone, with his other two warnings being read to him just four days earlier. See (Daniel Gov't Ex. 1 at 16:27:13-16:27:50; Daniel Gov't Ex. 2 at 1:16:45-1:19-59; Daniel Gov't Ex. 3). Afterward, Daniel proceeded to speak freely with the investigators, and "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his . . . rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Thompkins, 560 U.S. at 385 (citations omitted).

Moreover, Sgt. Hudson did not compel Daniel to sign the Waiver Certificate in exchange for information about his charges. Instead, Sgt. Hudson ensured that Daniel was willing to waive his rights before the interview began and in so doing,

clarified that Daniel did not have to sign the form or speak with the investigators, stating there would be "no hard feelings" if he declined to do so, but that if Daniel did want to talk to them, he would need to sign the form first, and he also reiterated that if Daniel did sign it, he could stop the questioning at any time. (Daniel Gov't Ex. 4 at 11:07-13:27); see also United States v. Hall, CRIMINAL NO. 1:CR-16-0050-01, 2016 WL 3683416, at *2 (M.D. Pa. July 12, 2016) (citation omitted) (concluding it was "immaterial [to the validity of defendant's Miranda waiver] that [d]efendant talked to the agents because he wanted to hear what they had to say"). "Overall, it is clear that [on both August 16 and August 20, 2019, Daniel] understood and acknowledged his Miranda rights before giving statements to the agents, and there is no evidence that he was threatened or otherwise coerced to do so," and therefore, "the totality of the circumstances reflects that [Daniel] knowingly, intelligently, and voluntarily waived his Miranda rights." Orr, 2015 WL 13871043, at *14. Accordingly, it is **RECOMMENDED** that Daniel's motion to suppress statements, [Doc. 95], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Davis' motion to suppress cell tower and GPS data evidence, [Doc. 92], be **GRANTED**, but that the other pending motions filed by defendants that have not been deferred to the District Judge, [Docs. 91, 93, 95, 96, 100, 130, 167, 168, 172, & 173],[44] be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 20th day of August, 2021.


*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[44] As previously noted, the motions to sever filed by Daniel and Davis, [Docs. 90 & 94], have been deferred to the District Judge, see [Docs. 208 & 209].